STATE of Wisconsin, Plaintiff-Respondent,

v.

Melvin MOSLEY, Defendant-Appellant-Petitioner.

Supreme Court

*No. 79–1219–CR. Argued June 3, 1981.—Decided June 30, 1981.*

(Also reported in 307 N.W.2d 200.)

For the petitioner there were briefs and oral argument by *Eric Schulenburg* of Madison.

For the respondent the cause was argued by *Chris Heikenen,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HEFFERNAN, J.   This is a review of an unpublished decision of the court of appeals[1] affirming the December 12, 1978, conviction of the defendant, Melvin Mosley, in the circuit court for Racine county on two counts of armed robbery in violation of sec. 943.32(1)(b), (2), Stats. 1977. After being sentenced to two concurrent twelve-year sentences, the defendant appealed from the judgment and from an order denying his motion for a new trial.

On the issues before it, the court of appeals ruled that the defendant's claim of unconstitutional out-of-court identification procedures, although not challenged before trial, was not waived under the circumstances and that on the merits the procedures employed were constitutional; and that the claim of impermissible multiplicitous charging, which it held waived, was in any case without merit.

We accepted this case in order to review these rulings, and in order to decide a question of first impression in this state which of necessity was not before the court of appeals: Whether sec. (Rule) 809.32(4), Stats., unconstitutionally deprives an indigent defendant of legal representation in the course of his request for a discretionary review by this court.

We conclude that sec. (Rule) 809.32(4), Stats., is constitutional because a criminal defendant is not constitutionally entitled to court-appointed counsel to assist

---

[1] Filed April 22, 1980.

him in the course of preparing a petition for review by this court. We also conclude that the allegedly unconstitutional identification procedures and multiplicitous charging are, under the circumstances, reviewable claims of error, but we reject both claims on their merits. Accordingly, we affirm the decision of the court of appeals upholding the defendant's conviction on both counts.

On the evening of September 11, 1978, the Kentucky Fried Chicken restaurant on State Street in Racine was robbed. At about 8:45 p.m., Eva Fink, the cashier, was mopping the customer lobby. Two black men entered the store; each of them was armed with a handgun. One pushed Eva back through the door into the work area and both followed her there. Eva and her two co-employees, Phil Downes and Chris Peterson, were ordered to lie down on the floor. One of the intruders, dressed in red shirt, tan pants, and tan shoes, took money from the cash register and put it in a bag. A customer entered the lobby; Eva was told she could go wait on the customer, and Chris and Phil were allowed to stand up in the work area.

When told that the rest of the money was in a desk in the office adjacent to the work area, the other man, dressed in black vest, pants, shoes and wearing a stocking mask, went into the office. When he returned, the men asked where the back door was and left. The entire incident took between five and fifteen minutes. Money was found missing from the office desk; and Eva's watch, two rings, and money from her purse, all of which she had earlier placed on a shelf in the office, were gone.

Chris wrote down his and the others' descriptions of the men, including a tattoo on the arm of the man in black stating "Al-Baby" or "Al-Bob," the men's color, height, clothing, and two handguns.

It appears that shortly after the robbery the police apprehended Terry Wilson, whom the employees identified that evening as the man in the red shirt.

Racine Police Detective Rannow arrested the defendant about one week later while investigating a civil call for assistance. Upon arriving, Detective Rannow observed that the black male in the argument fit the description of the missing armed robbery suspect, with respect to height, weight, skin tone, facial hair, and an arm tattoo which read "Ali Baba." The defendant was photographed at the jail on September 18, 1978.

The next day, Detective Thomas Cooper selected four other photos of black males and showed five photographs to each witness independently, handing them over in a bunch with the defendant's somewhere in the middle. Each photo contained three poses—a full body front pose, a profile and one of the head facing the camera. Only the defendant had visible tattoos. No verbal suggestions were made.

Eva could make no positive identification, but Chris and Phil both identified the photograph of the defendant as the second robber. Chris and Phil also identified the defendant in court. Chris testified that the man's nylon stocking that night was held somewhat away from his face by a beard and Afro, although it obstructed some vision. While lying down, Chris viewed the man for a period which he estimated as three or four minutes, from a distance of seven feet; and, while standing up, he observed the back left side of the man's face, the tattoo, and his body for "a couple of minutes" from three feet. He testified he studied the man's face, body, and structure, concentrating on clothes, build, and facial scars or marks, for about four minutes in total.

Phil testified that, although the stocking cap was tight against the robber's face, when the customer entered he observed the robber with mask raised, for "a split second" from a distance of two to five feet, first in profile and then face on. Phil again saw his face uncovered when the robber came out of the office. This time the mask was

raised for about three seconds, and Phil saw a frontal view for about one second from a distance of two feet.

After the state rested, the defendant took the stand, and denied absolutely any knowledge of the robbery, familiarity with the store, ownership of a gun, recall of his whereabouts on the date of the robbery, or knowledge of Terry Wilson (other than from their mutual incarceration in jail). He denied wearing an Afro at the time of the robbery, described his left-arm tattoo as two fork-like animals and the lettering "Alex Dexbar" (or "Alix Daxbar"), showed it to the jury, and stated that the tattoo had been the same on and before September 11 as it was on the date of trial. On cross-examination he admitted to having once been convicted of a crime.

The defendant contends on this review that the information charging two counts of armed robbery was multiplicitous. The court of appeals agreed with the state that such a claim was waived because no objection to the information was made before trial under sec. 971.31(2), Stats.[2] The court of appeals proceeded nonetheless in *dicta* to determine that the information was

---

[2] **"971.31 Motions before trial.**

"(2) Except as provided in sub. (5), defenses and objections based on defects in the institution of the proceedings, insufficiency of the complaint, information or indictment, invalidity in whole or in part of the statute on which the prosecution is founded, or the use of illegal means to secure evidence shall be raised before trial by motion or be deemed waived. The court may, however, entertain such motion at the trial, in which case the defendant waives any jeopardy that may have attached. The motion to suppress evidence shall be so entertained with waiver of jeopardy when it appears that the defendant is surprised by the state's possession of such evidence.

". . .

"(5) . . .

"(c) In felony actions, objections based on the insufficiency of the complaint shall be made prior to the preliminary examination or waiver thereof or be deemed waived."

not multiplicitous. We address the issue in the interests of justice, observing that the matter arose at the preliminary hearing,[3] that there was a subsequent change in defendant's trial counsel, that the issue was raised twice after trial (at sentencing and upon motion for new trial), and that because the issue is one of double jeopardy, the claimed error is of serious potential constitutional magnitude. *Manson v. State,* 101 Wis.2d 413, 417 n. 2, 304 N.W.2d 729 (1981) ; sec. 751.06, Stats.

The information charged two counts of armed robbery in violation of sec. 943.32(1)(b), (2), Stats. 1977.[4] The

---

[3] Defendant was charged by criminal complaint filed September 21, 1978, with two counts of armed robbery, each alleging a violation of sec. 943.32(1)(b), (2), Stats. (1977). The first count charged defendant with taking money from the cash register and office. The second incorporated the "facts and information" alleged in the first and alleged, additionally, that the defendant took cash, change, and jewelry from Eva Fink's purse. At the preliminary hearing held September 27, the court *sua sponte* ruled that it was permissible to charge both counts on the rationale that Eva could wear "two hats"—one as an employee of the restaurant, and one as owner of her own property, which would support the second count. Defense counsel also moved to dismiss the complaint on the ground, *inter alia,* that Eva's personal effects were not alleged to have been taken from her "presence" (sec. 943.32(1), Stats.) inasmuch as she was in a different room at the time, segregated from view, so the taking was at maximum theft, not robbery. The court denied the motion, and bound the defendant over on both counts.

[4] "943.32 **Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means is guilty of a Class C felony:

"(a) . . .

"(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

"(2) Whoever violates sub. (1) while armed with a dangerous weapon is guilty of a Class B felony.

"(3) In this section 'owner' means a person in possession of property whether his possession is lawful or unlawful."

first alleged the taking of "property from the person or presence of Chris Peterson and Phillip Downes"; the second, the taking of "property from the person or presence of Eva Fink." If there were any doubt in the sense of notice as to the meaning of "property" in Count 2 of the information, the complaint makes clear that this reference was to Eva's personal effects, not the restaurant's revenues for the evening which were kept in the cash register and office desk. The court instructed the jury that Count 1 referred to the restaurant's money and Count 2 to Eva's effects. The issue is whether, on the facts of the case, these two counts impermissibly fractionate a single offense into two charges. Stated otherwise, the question is whether the taking of "property from the . . . presence of Chris and Phil" (the restaurant's money) and the taking of Eva's belongings constituted two distinct chargeable armed robbery offenses.

As we stated recently in *State v. Rabe,* 96 Wis.2d 48, 63, 291 N.W.2d 809 (1980), the question has two aspects. *See also Blenski v. State,* 73 Wis.2d 685, 245 N.W.2d 906 (1976). The first concerns double jeopardy, as charging two counts for one offense would impermissibly subject a defendant to multiple punishments for the same offense. The second inquiry concerns legislative intent as to the allowable unit of prosecution under the statute. We consider these inquiries in that order.

The double jeopardy prong is tested by "whether the severed offenses are 'identical in law and in fact.' " *Rabe, supra,* 96 Wis.2d at 63. The two counts herein are identi-

Subsection (2) has since been amended to read:

"(2) Whoever violates sub. (1) by use or threat of use of a dangerous weapon or any article used or fashioned in a manner to lead the victim reasonably to believe that it is a dangerous weapon is guilty of a Class B felony."

Ch. 114, sec. 2, Laws of 1979. The 1977 version, however, governs this case.

cal in law, as both allege violation of sec. 943.32(1) (b), (2), Stats. 1977. Thus the inquiry becomes only " 'whether each count requires proof of an additional fact which the other count . . . do[es] not.' " *Id.* This test is met in the present case. Count 1 required proof that the defendant took money from Phil and Chris as owners (of the restaurant money),[5] whereas Count 2 did not; Count 2 required proof that the defendant took the effects of Eva Fink, a fact not required by Count 1. Whether these factual distinctions be viewed as signifying different "acts" (as in *Rabe, supra*) or different "victims" (as in *State v. Eisch,* 96 Wis.2d 25, 291 N.W.2d 800 (1980)), or both, it is clear that each count requires proof of a fact not required by the other; the " 'evidence sufficient for conviction under the first charge would not have convicted under the second indictment.' " *Rabe, supra,* 96 Wis.2d at 67.[6]

The second inquiry is whether, even though the multiple counts not be violative of double jeopardy, they com-

---

[5] The count named Phil and Chris; the theory was clearly implicit that they were agents of the restaurant and thus "owners" for the moment under sec. 943.32(3), Stats. "The essential condition is that the defendant act in conflict with the interest of a person whose right of possession is superior to his own. For example, as between the clerk in a . . . store and the alleged robber, the clerk has possession although as between the clerk and the store owner the clerk may have only custody rather than possession. The taking from the clerk under the circumstances involving an additional risk to the victim will constitute robbery in Wisconsin." G. Baldwin, *Criminal Misappropriations in Wisconsin—Part II,* 44 Marq. L. Rev. 430, 447 (1961). *See also* LaFave and Scott, *Handbook on Criminal Law* 693 (1972 ed.).

[6] We emphasize, however, that the counts in this case are not parsed according to the fact that the taking of the *restaurant's* money was from two *loci* (the cash register and the office) separated only by a brief time interval; nor are the counts parsed on the basis that the restaurant's money was taken from more than one employee. These matters, if so charged, would be materially different and might pose a different question as to double jeopardy.

port with the legislative intent as to the allowable unit of prosecution under sec. 943.32(1)(b), (2), Stats. 1977. *Rabe, supra,* 96 Wis.2d at 63, 69–77.

We think that the statute contemplates the permissibility of charging two counts under the facts of the present case.

We note, first, that the statute requires that the perpetrator, by threatening imminent use of force against the owner or another present, intend to "compel the owner to acquiesce" in the taking or carrying away of property. Sec. 943.32(1)(b), Stats. "Owner" is defined in sub. (3) as a "person in possession of property"; such possession, by operation of sec. 971.33 may be actual or constructive.[7]

At the time the defendant went into the office it is clear that none of the employees had actual ("hands-on") possession of either the restaurant's money in the desk or Eva's effects.

As to the restaurant's money in the office desk, all three employees could be said to have the same constructive possession (in the sense of control, dominion, or interest). As to that property, they were all equally "owners" under the statute.

As to the jewelry and purse on the office shelf, however, only Eva could be considered to be in constructive possession and hence an "owner." She was the only one with any possessory interest in that property; neither Chris nor Phil had any dominion over or interest in it, as bailees or otherwise.[8] Indeed, so far as the record indicates, neither even knew it was there.

---

[7] "971.33 Possession of property, what sufficient. In the prosecution of any crime committed by stealing, damaging or fraudulently receiving or concealing personal property, it is sufficient if it is proved that at the time the crime was committed either the actual or constructive possession was in the person alleged to be the owner thereof."

[8] Clark and Marshall note that at common law, property, to be the subject of a robbery, had to either "belong to" or be "under

It is therefore apparent that Eva was an "owner" of property, in the sense that term is used in the statute, in a capacity clearly distinct and separate from the capacity in which Chris and Phil (and indeed she) were "owners" with respect to the restaurant's money.

Further, we note that the criteria we use in assessing whether offenses are separate or not include how far the acts are separated in time, and how different they are in nature. *See State v. Eisch, supra,* 96 Wis.2d at 31. In the present case, the evidence supports the inference that when the defendant went into the office he took the restaurant's money from a desk drawer, and Eva's effects from a shelf in that room. Although closely related in time, these constituted two different types of takings. The defendant may be presumed to have known that the money he took from the desk belonged to the restaurant, since he went there and removed it upon the employees' express instructions in response to his inquiry where the remainder of the money was kept. The evidence indicates that, while there, he observed and took the personal effects on the shelf. These articles—jewelry and a purse— were different in nature, and their taking was of a different sort. The defendant may properly be held to knowledge that such items constituted the effects of a person (probably an employee) rather than the revenues of the restaurant. This fact adequately precludes a defendant from convincingly arguing, in such a situation, that he may be held for multiple charges due to some random "roll of the dice." *Rabe, supra,* 96 Wis.2d at 75.

---

the protection and control of" the victim. Clark and Marshall, *A Treatise on the Law of Crimes* 885 (7th ed. 1967). *Cf.* 2 *Wharton's Criminal Law and Procedure* 271–72 (Anderson ed. 1957), stating, "It is sufficient that the victim had prior possession, without regard to whether he had title to or any interest in the property, and giving examples such as bailee, employee, cashier, night watchman, etc. Thus either possession (constructive or actual) or control seems required."

Because Eva was a distinct owner, from whom distinct property was taken, and because the defendant could be charged with knowledge of the different nature of the property and its different ownership, the offense charged with respect thereto was not "the same" as the offense charged in Count 1. It was permissibly charged under sec. 943.32, Stats.

Defendant raises a final challenge to the count charging the robbery of Eva's property. He argues, and the record substantiates, that Eva was in another room while the defendant was in the office taking her money and jewelry, and that she did not realize they had been taken until after the fact. The record shows that at this time guns were on display and Eva was in a state of fear. The defendant argues, however, that her ignorance of the taking at the time (as it occurred in a different room) means that the statutory requirement that the owner's property be taken from his "person or presence," sec. 943.32(1), is not met. We disagree.

Professor Gordon Baldwin of the University of Wisconsin Law School wrote, in describing sec. 943.32, Stats., "Nothing in the statute requires that the victim actually be aware of the taking if the requisite risk [of safety to the victim due to use or threatened imminent use of force] is present." G. Baldwin, *Criminal Misappropriations in Wisconsin—Part II*, 44 Marq. L. Rev. 430, 448 (1961). We are satisfied that this is a correct statement of the law and comports with the weight of authority on the subject.

LaFave and Scott observe in their *Handbook on Criminal Law* 696 (1972):

"The phrase 'from the presence' or 'in the presence' has been construed in a number of cases. 'Presence' in this connection is not so much a matter of eyesight as it is one of proximity and control; the property taken in the robbery must be close enough to the victim and suf-

ficiently under his control that, had the latter not been subjected to violence or intimidation by the robber, he could have prevented the taking. Thus the robber takes property from the victim's presence if he locks or ties the victim up in one room of a building and then helps himself to valuables located in another room of the same building; and this is so even though, because of the walls, one cannot see from the one room into the other. Conversely, it would not be robbery to use force or fear to immobilize a property owner at one place while a confederate takes the owner's property from a place several miles away, even though, by using a spy glass, one might see from the one place to the other; for the distance between the owner and his property is such that the owner could not have prevented the taking even if he had been free to try to interfere."

To similar effect is Clark and Marshall, *A Treatise on the Law of Crimes* (7th ed. 1967) :

"It is not even necessary that the taking shall be in the immediate presence of the owner. It is enough if the property is so near that it can be said to be in his personal custody and care—as where it is in another room of the house where he is—and if the taking of it is accomplished by violence or by putting him in fear." Sec. 12.12, p. 888.

. . .

"[I]t makes no difference that the victim does not know that he is being robbed." Sec. 12.13, p. 890; sec. 12.14, pp. 894–95.

In agreement is 2 *Wharton's Criminal Law and Procedure* (Anderson ed. 1957).[9] *See also State v. McDon-*

[9] "An object is deemed within the presence of a person when it is within his area of control.

"The preposition 'from,' as used in defining the offense, does not convey the idea of contact or propinquity of the person and property, nor that the property is in the actual or immediate presence of the person. Hence the offense may be committed when the property, though not in the immediate presence of the owner, is under his control, as in another room of the house, or in another building on his premises." Sec. 553, pp. 254–55.

*ald,* 443 P.2d 651 (1968). In that case an employee of a supermarket, upon seeing intruders, dropped a parcel of cash and checks and was then forced into a produce cooler. He emerged, with fellow employees, one minute later to find the parcel gone (and the safe and cash registers rifled). The court held that the failure of anyone to see the defendants actually pick up the parcel did not militate against the state's proof of a taking from the person or presence of another:

". . . the authorities are in accord that it can be a taking from a person or in his presence even though the victim was not immediately present where the victim, by force or fear, had been removed from or prevented from approaching the place from which the asportation of the personalty occurred." *Id.* at 653.

What emerges from these authorities is that where the victim has been intimidated or placed in fear by use or threat of force—as to which there was ample testimony in this case—and the property is taken from an area sufficiently close and under his control that, but for the robber's intimidation or force he could have prevented the taking, the taking is from his "presence" under sec. 943.-32(1) ; and this conclusion is not defeated by an unawareness of the taking as it occurs. In the present case, the office from which Eva's belongings were taken was a part of the area in which she worked, and sufficiently subject to her control that she could have prevented the taking but for her intimidation. We conclude that the taking was therefore from her "presence."

The defendant also contends on this review that his convictions should be set aside on the grounds that the pre-trial identification procedures by photograph were impermissibly suggestive and not otherwise reliable, in

"If force or fear was employed by the defendant the offense is robbery without regard to whether the victim was deceived as to the defendant's purpose and did not apprehend or perceive that a robbery was intended or being perpetrated." Sec. 560, p. 267.

violation of due process, and that the in-court identifications of the defendant by the witnesses were fatally tainted thereby. The state's first response is that any appellate review of this alleged error is waived.

Section 971.31(2), Stats., provides that certain objections, defenses and motions

". . . shall be raised before trial by motion or be deemed waived. The court may, however, entertain such motion at trial, in which case the defendant waives any jeopardy that may have attached. . . ."

Although the defendant failed to object to the photo-identification procedure either before trial as contemplated in the statute or upon admission of the photographic evidence and testimony thereon, he did so at the close of the state's case-in-chief by making a motion to dismiss. The trial court, in denying the motion, considered the objection at that time. The same issue was raised and discussed at length, and rejected by the trial court, in a motion at the sentencing conference, at which time the trial court noted, "You [defense counsel] have amplified the record now and—so that matter can be reviewed without problem." We conclude that, under the circumstances, appellate review of this issue was not waived.

We have previously observed that sec. 971.31(2), Stats., serves a legitimate state interest in providing an expedient and efficient means of culling out inadmissible evidence, "and its purpose should not be frustrated by exceptions and second guesses." *Day v. State,* 52 Wis.2d 122, 123–24 (1971); *see also Madison v. State,* 64 Wis.2d 564, 219 N.W.2d 259 (1974). In both cases we held that objections not made were waived and would not be reviewed, and there was no basis in the interests of justice for making an exception. The state argues that sec. 971.31(2) should be read especially strictly where, as here,

the defendant's challenge is to the constitutionality of identification procedures. This is because if a pre-trial identification procedure is shown by a defendant to be impermissibly suggestive, the burden then shifts to the state to demonstrate that the procedure was otherwise reliable under the totality of the circumstances, and, if the subsequent in-court identification is also challenged, that there exists an independent basis for that identification. *Powell v. State*, 86 Wis.2d 51, 65–66, 271 N.W.2d 610 (1978). Because the state's ability to prove such matters may depend on its developing additional evidence, the state argues that the objection is untimely where it is raised at the close of the state's case-in-chief rather than at an earlier time.

As a general matter, there is considerable merit to the state's position, and the better practice is for the defense to raise such objections before trial. However, we note that the statute does on its face appear to authorize later trial court consideration of such motions; and we agree with the court of appeals that in the present case the state's ability to demonstrate the propriety of the identification was not so compromised as to preclude appellate review. Despite the fact that the defense objection was not made until the close of the state's case, the state had already carefully delineated, by witnesses' testimony, the identification procedures used, and makes no claim on review that there existed any other witnesses or evidence which would have been exploited at trial to vindicate the procedures used had the objection been timely made.[10]

---

[10] The fact that the issue was raised at all and that the trial court gave it sufficient consideration distinguishes this case from *Madison v. State, supra,* where no objection whatsoever was raised either before or at trial.

Accordingly, we conclude that in this case appellate review of the alleged error is proper. We note also, as we commented in both *Day* and *Madison, supra* (and *see Maclin v. State,* 92 Wis.2d 323, 284 N.W.2d 661 (1979)), that we could consider the alleged constitutional error in this case "in the interests of justice," even were we to conclude that the error was insufficiently preserved. We therefore turn to the merits of the claimed impermissible identification procedures.

In *Powell v. State,* 86 Wis.2d 51, 271 N.W.2d 610 (1978), we set forth the analytic framework by which such claims are evaluated. The first inquiry is whether the out-of-court photographic identification was impermissibly suggestive, as to which the defendant has the burden. If this burden is not met, no further inquiry is necessary. *Id.* at 68; *Fells v. State,* 65 Wis.2d 525, 223 N.W.2d 507 (1974). If it is met, however, the burden shifts to the state to show that despite the improper suggestiveness, the identification was nonetheless reliable under the "totality of the circumstances"; and, where a subsequent *in*-court identification is also challenged as tainted by the prior one, the state must show the in-court identification derives from an independent basis. *Powell, supra,* 86 Wis.2d at 64–66.

The first inquiry is whether the photographic display shown to the witnesses was impermissibly suggestive. The trial court twice ruled that it was not, and the court of appeals ruled that it was. We sustain the determination of the trial court.

Suggestiveness in photographic arrays may arise in several ways—the manner in which the photos are presented or displayed, the words or actions of the law enforcement official overseeing the viewing, or some aspect of the photographs themselves. *Powell, supra,* 86 Wis.2d at 62–63. The testimony amply demonstrates that the first two considerations are not a problem in this case. As the trial court ruled, the witnesses were

presented the photographs for examination without any apparent suggestion or encouragement or in any order which might tend to sway their identification. The only source of potential suggestiveness, therefore, arises from the fact that of the five photos, only the defendant and one other wore short sleeves, and only the defendant had a tattoo visible in the picture.

While this problem could, and probably should, have been avoided by the simple expedient of having the defendant wear a long-sleeved shirt while being photographed,[11] or by selecting other tattooed persons for the photographic array, there is insufficient evidence upon which to conclude that the array was unduly suggestive under the circumstances. Under *Powell, supra,* it was the defendant's burden to show that it was; but the only testimony by the witnesses as to the effect of the visibility of the tattoo in the picture of the defendant was that of Chris Peterson on cross-examination. This testimony was as follows:

"*Q.* Is the existence of the tattoo or the remnant of the tattoo that you could see on this photograph, was that significant in your determining that individual was the man that was at the Kentucky Fried Chicken? *A.* Not totally. It was part of it.

"*Q.* Okay. It was, however, significant, was it not? *A.* Yes.

"*Q.* Okay. Could you read the tattoo on the arm in the photograph that was presented to you? *A.* No, I couldn't.

"*Q.* It just looked to be in the area that you saw the tattoo on the assailant? *A.* Yes."

The trial court also noted that the tattoo was apparent in the photograph but "rather difficult to make out."

---

[11] Recommending such a procedure, *see* Eisenberg and Feustel, *Pretrial Identification: An Attempt to Articulate Constitutional Criteria,* 58 Marq. L. Rev. 659, 671 (1975).

We recognize that we have previously stated that a photograph procedure "which includes a photo which is unique in a manner directly related to an important identification factor may be held impermissibly suggestive," *Powell, supra,* at 66–67; *Fells v. State,* 65 Wis. 2d 525, 223 N.W.2d 507 (1974). In *Powell,* however, our actual holding was that, although of five photos shown only the defendant appeared in a beard, his facial hair was "not particularly striking or pronounced" and some of the other subjects also had mustaches and sideburns, so the array was not impermissibly suggestive. We think the appearance of the tattoo on the defendant in this array is to similar effect, especially in light of the fact that the picture shows a tattoo on the other arm as well, which was not commented on nor apparently relied upon by any of the witnesses in their identification.[12] While we intend no approval of the use of suggestive photos that could, as in this case, readily be avoided, we decline to assume that a unique identifying feature *ipso facto* is unduly suggestive, without more persuasive proof by the defendant, under his assigned burden, that such was the case in fact.

Under *Powell, supra,* we need take our analysis no further. However, we do so to demonstrate that even if the display was improperly suggestive because of the

---

[12] *See also Schaffer v. State,* 75 Wis.2d 673, 250 N.W.2d 326 (1977). In that case it appeared probable from the record that the defendant was the only one in a lineup who wore a gold earring and the witnesses had noticed this earring during the robbery. We held, despite this fact, that the lineup was not unduly suggestive. *Id.* at 681. *Schaffer* is distinguishable from the present case by the fact that the eyewitnesses therein did not testify that they were influenced by the presence of the earring during the lineup identification, unlike Chris Peterson's testimony in this case; but *Schaffer* supports the view that a unique identifying feature does not *ipso facto* render an out-of-court identification procedure unduly suggestive.

visibility of the tattoo, the state met its burden to show that under the totality of the circumstances, the procedure produced a sufficiently reliable identification. The factors to be considered under this part of the analysis are:

". . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Powell, supra,* 86 Wis.2d at 51, quoting *Neil v. Biggers,* 409 U.S. 188, 199–200 (1972).

Both Chris and Phil, the witnesses identifying the defendant from the photographs, attentively observed the man dressed in black during the robbery and described him accurately.[13] On two occasions, albeit briefly, Phil saw his face unmasked. Chris concentrated on the defendant's clothes and build, and face insofar as visible under the stocking, for a number of minutes. Although both thought they saw familiar faces while initially looking at photos which did not include the defendant, both apparently made positive identifications of the defendant when actually shown his photograph; moreover, the identifications were made only one week after the robbery. We are satisfied that, under the totality of the circumstances, these factors avoided the "very substantial likelihood of . . . misidentification" (*Powell, supra,* at 64, quoting *Neil v. Biggers, supra,* 409 U.S. at 198–99) which is necessary to justify setting aside a conviction.

---

[13] Neither Chris nor Phil testified as to the height of the man dressed in black; the paper on which the employees wrote down their descriptions of the men's height stated that they were 5' 4" and 5' 7", without identifying which was which. Defendant's photograph, backed by a height-marker, reveals that he is between 5' 9" and 5' 10", as he stated himself.

Finally, we conclude that the subsequent in-court identification was sufficiently independent of the photo-identification to avoid any taint which would arise therefrom even if the procedure were viewed as impermissibly suggestive. Chris testified that his in-court identification of the defendant was based on the latter's body build and face, not the tattoo. It cannot be said that this recollection was insufficiently independent of any influence that the tattoo might have had on the photographic identification. *See Rozga v. State,* 58 Wis. 2d 434, 443, 206 N.W.2d 606 (1973). Moreover, the written description made immediately after the robbery was introduced contained a substantially accurate description of a tattoo as the defendant's was shown to exist at the time of trial.

We conclude, therefore, that the photographic identification procedure and the testimony concerning it at trial were not unconstitutional, nor was the in-court identification an impermissibly tainted product of that identification.

Defendant also claims on this review that he received inadequate trial counsel.[14] The major basis of that claim is the failure to timely challenge the charging and the identification and preserve the errors alleged in respect to those matters. As we have decided these issues, we

---

[14] The defendant has had different counsel at each stage of the proceedings against him. After the preliminary hearing and arraignment the defendant parted ways with his first attorney. The next attorney, trial counsel, obtained an adjournment of trial for one month. At the beginning of trial, the defendant moved *pro se* for a continuance on the ground that the attorney was unprepared, and had not come to see him, but the attorney averred his readiness and the court denied the motion. The defendant renewed his inadequacy of counsel claim *pro se* after verdict. A public defender represented him on appeal to the court of appeals, a different public defender handled correspondence to this court, and we appointed attorney Eric Shulenberg to handle briefing and oral argument in this court.

do not find it necessary to address the claim in light thereof.

The defendant contends, however, that there may be other reasons why trial counsel was inadequate, or additional reasons bearing on the matters discussed above, such as an alleged impermissible one-person lineup at the police station on the day of arrest, as to which there could, the defendant argues, have been a pre-trial hearing had the attorney at that stage made objection under sec. 971.31, Stats.

We do not reach such matters and express no view of their merit because the record before us is inadequate in those respects. A claim of inadequate trial counsel is to be raised by a hearing in the trial court, at which trial counsel can testify concerning the reasons behind actions taken. *State v. Simmons*, 57 Wis.2d 285, 203 N.W. 2d 887 (1973); *State v. Machner*, 92 Wis.2d 797, 285 N.W.2d 905 (Ct. App. 1979). If there are any grounds for such a claim at this stage of the proceedings they may be raised by motion pursuant to sec. 974.06, Stats.

We turn now to the final issue, necessarily argued for the first time on this review as it involves a question raised only by our system of granting and denying discretionary review—the scope of a defendant's right to counsel, such as it may be, in invoking review by this court.

After the defendant was sentenced, a state public defender was appointed[15] to provide him with appellate

[15] Apparently the appointment was pursuant to sec. 809.30(1) (c), Stats., which provides:

"809.30 Rule (Appeals in felony cases). (1) APPEAL OR POST-CONVICTION MOTION BY DEFENDANT.

" . . .

"(c) If the defendant claims or appears to be indigent and wishes to have publicly compensated counsel to represent the defendant in seeking postconviction relief, the defendant shall notify

representation. The court of appeals, deciding the case on briefs, decided the issues of multiplicitous charging and impermissible identification against the defendant and affirmed his convictions.

Although the record does not disclose deliberations at this time between the defendant and the public defender —a matter which we will address later in this opinion —we must presume that at this point the public defender's office concluded that pursuit of further review was not warranted. This is because the public defender's petition for review in this court, filed on May 16, 1980, was based on a "no merit" assessment of the case pursuant to (Rule) sec. 809.32(4), Stats., which provides:

"809.32   Rule (No merit reports).

" . . .

"(4) If a fully briefed appeal is taken to the court of appeals and the attorney is of the opinion that a petition to appeal in the supreme court under Rule 809.62 would be frivolous and without any arguable merit, the attorney shall advise the defendant of the reasons for his opinion and that the defendant has the right to file a petition to appeal. If requested by the defendant, the attorney shall file the petition to appeal and the defendant shall file a statement of reasons in support of the petition."

In accordance with this statute, the defendant, with the assistance of the WCI Paralegal Program, filed with this court on June 5, 1980, a *pro se* statement of reasons in support of the petition. One of the major reasons we granted review in this case was to consider the defendant's *pro se* challenge therein to the very procedure by which review was sought: Whether sec. (Rule) 809.32 (4) unconstitutionally deprives an indigent defendant of

---

the state public defender within 45 days of the date of sentencing or imposition of fine or probation. The state public defender shall determine the defendant's indigency and appoint counsel as provided in ch. 977, and at the same time shall request the court reporter to prepare the transcript of notes of the proceedings in the case."

legal representation in the course of his request for a discretionary review by this court of a decision of the court of appeals. We subsequently appointed counsel to brief and argue the defendant's claims in this court.[16]

We begin by noting that we are not here confronted with a question of the right to, or value of, court-appointed counsel upon a first appeal as of right to the court of appeals, nor even with the same considerations upon briefing or oral argument in this court once we have granted a discretionary review. We face only the narrow question whether an indigent defendant, whose criminal conviction has been affirmed upon a plenary appeal to the court of appeals accompanied by full assistance of counsel, is constitutionally entitled to court-appointed counsel in the course of preparing his petition for review by this court.

Prior to the creation of the Wisconsin court of appeals, this court heard criminal appeals from the trial courts as of right. Under those circumstances, of course, a decision by counsel to decline to represent an indigent client on appeal to this court on the ground that the case lacked merit could preclude *any* appellate review

---

[16] After our grant of review, the defendant apparently again contacted the public defender for assistance in briefing his case to this court. Donald Laing of that office—a different public defender from the one who handled the case in the court of appeals —stated in correspondence to this court that while the public defender would pursue the issues decided by the court of appeals, it feared a conflict of interest in arguing the newly raised constitutional merits of sec. (Rule) 809.32(4), Stats., as that statute had been written by former state public defender Howard Eisenberg, and its litigation might also implicate the appellate conduct of the public defender who handled the case at the court of appeals.

Accordingly, we issued an order on January 2, 1981, affirming our intent to consider the issues raised by the defendant *pro se* and relieving the public defender of further representation, appointing attorney Eric Schulenberg to represent him in this court.

accompanied by counsel. This was the problem which the United States Supreme Court faced in *Anders v. California,* 386 U.S. 738 (1967), wherein it established detailed procedures by which an appellate court of first appeal, and the indigent client, were both to be afforded ample opportunity to review and respond to a decision by the attorney to decline to pursue the appeal. This was to ensure that the appeal was in fact wholly unmeritorious, before the reviewing court concluded that appellate review accompanied by counsel was unnecessary. *Id.* at 744. With some modification, we applied the *Anders* procedures in Wisconsin on our review of counsel refusal to take criminal appeals of right from the state's trial courts. *See Cleghorn v. State,* 55 Wis.2d 466, 198 N.W.2d 577 (1972); H. B. Eisenberg, *No Merit Briefs in the Wisconsin Supreme Court,* 45 Wis. Bar Bull. No. 2, 28–30 (April 1972).

When the court of appeals was created in 1978, we codified these procedures so that that court, which became the court of first review, would apply them as we had previously done. *See* 83 Wis.2d xiii, xxxviii, *codified at* sec. (Rule) 809.32, Stats.[17] The first three sub-

---

[17] The Rule provides in its entirety:

"**809.32 Rule (No merit reports).** (1) If an attorney appointed under s. 967.06(3) or Rule 809.30 is of the opinion that further appellate proceedings on behalf of the defendant would be frivolous and without any arguable merit within the meaning of *Anders v. California,* 386 U.S. 738 (1967), the attorney shall file with the court of appeals 3 copies of a brief in which is stated anything in the record that might arguably support the appeal and a discussion of why the issue lacks merit. The attorney shall serve a copy of the brief on the defendant, who may file a response to the brief within 30 days of service.

"(2) The attorney also shall file in the trial court a notice of appeal of the judgment of conviction and of any order denying a postconviction motion. The clerk of the trial court shall transmit the record in the case to the court pursuant to Rule 809.15. The no merit brief and notice of appeal must be filed within 180

sections largely state the procedures we had previously applied when we were the court reviewing appeals of right, and now to be applied by the court of appeals. Subsection (4) was new, and defined procedures to be followed where appellate counsel determines that pursuit of further review in this court, after full hearing and decision at the court of appeals, would be frivolous and without merit. The entire codified rule "brings the no merit procedure into conformity with the two level appellate court system." Martineau and Malmgren, *Wisconsin Appellate Practice,* sec. 2709, p. 180 (1978).

We conclude in this case that subsection (4) of the rule passes constitutional scrutiny although it does not secure an indigent person the right to counsel in preparing his petition for review.

In *Douglas v. California,* 372 U.S. 353 (1972), the United States Supreme Court struck down a California rule of criminal appeal which authorized an appellate court of first review, acting alone without the aid of defense counsel, to determine from the record *whether*

---

days of the service upon the defendant of the transcript under Rule 809.30(1)(e).

"(3) In the event the court of appeals finds that further appellate proceedings would be frivolous and without any arguable merit, the court of appeals shall affirm the judgment of conviction and the denial of any postconviction motion and relieve the attorney of further responsibility in the case. The attorney shall advise the defendant of his right to file a petition for appeal to the supreme court under Rule 809.62.

"(4) If a fully briefed appeal is taken to the court of appeals and the attorney is of the opinion that a petition to appeal in the supreme court under Rule 809.62 would be frivolous and without any arguable merit, the attorney shall advise the defendant of the reasons for his opinion and that the defendant has the right to file a petition to appeal. If requested by the defendant, the attorney shall file the petition to appeal and the defendant shall file a statement of reasons in support of the petition."

counsel should be appointed to handle the appeal. In ruling that under the circumstances there was a right to court-appointed appellate counsel, Justice Douglas wrote for the court:

"We are not here concerned with problems that might arise from the denial of counsel for the preparation of a petition for discretionary or mandatory review beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court. We are dealing only with the *first appeal,* granted as a matter of right to rich and poor alike (Cal. Penal Code secs. 1235, 1237), from a criminal conviction. We need not now decide whether California would have to provide counsel for an indigent seeking a discretionary hearing from the California Supreme Court after the District Court of Appeal had sustained his conviction (see Cal. Const., Art. VI, sec. 4c; Cal. Rules on Appeal, Rules 28, 29). . . . But it is appropriate to observe that a State can, consistently with the Fourteenth Amendment, provide for differences so long as the result does not amount to a denial of due process or an 'invidious discrimination.' *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489; *Griffin v. Illinois, supra,* p. 18. Absolute equality is not required; lines can be and are drawn and we often sustain them. See *Tigner v. Texas,* 310 U.S. 141; *Goesaert v. Cleary,* 335 U.S. 464. But where the merits of *the one and only appeal* an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor.

"When an indigent is forced to run this gauntlet of a preliminary showing of merit, the right to appeal does not comport with fair procedure." *Id.* at 356–57.

In *Ross v. Moffitt,* 417 U.S. 600 (1974), the court expressly declined to extend *Douglas* beyond first appeals of right. The defendant in *Moffitt* had been convicted in a North Carolina trial court and received state appointed counsel at his first level of appeal in the state court system. The court held, as we do in this case, that North Carolina was not constitutionally obligated to go fur-

ther and furnish counsel to assist him in invoking the
discretionary review procedures of the North Carolina
Supreme Court. Neither due process nor equal protec-
tion required such a result.

In rejecting the due process challenge, the court con-
trasted trial proceedings, where the state initiates prose-
cution and counsel is essential for a fair trial, to appel-
late review:

"By contrast, it is ordinarily the defendant, rather
than the State, who initiates the appellate process, seek-
ing not to fend off the efforts of the State's prosecutor
but rather to overturn a finding of guilt made by a
judge or jury below. The defendant needs an attorney
on appeal not as a shield to protect him against being
'haled into court' by the State and stripped of his pre-
sumption of innocence, but rather as a sword to upset the
prior determination of guilt. This difference is signifi-
cant for, while no one would agree that the State may
simply dispense with the trial stage of proceedings with-
out a criminal defendant's consent, it is clear that the
State need not provide any appeal at all. *McKane v.
Durston,* 153 U.S. 684 (1894). The fact that an appeal
*has* been provided does not automatically mean that a
State then acts unfairly by refusing to provide counsel
to indigent defendants at every stage of the way. *Doug-
las v. California, supra," Id.* at 610–11.

Unfairness only results if defendants are singled out
on the basis of indigency and denied meaningful access
to the appellate system on that basis, a matter of equal
protection. *Id.* The court likewise rejected that claim.
It first observed that absolute equality of treatment is
not constitutionally required, but rather there must not
be "unreasoned" distinctions or absolute preclusions of
some meaningful appeal. *Id.* at 612. The court then de-
scribed North Carolina's two-tiered appellate court sys-
tem, which, like Wisconsin's, included (for most cases)
review as of right at the first level and discretionary
review at the second, the latter governed by published

statutory standards (similar to Wisconsin's judicially promulgated ones, *see* 85 Wis.2d xiii). The court noted that the defendant had received one full appellate review with counsel, and concluded:

"We do not believe that it can be said, therefore, that a defendant in respondent's circumstances is denied meaningful access to the North Carolina Supreme Court simply because the State does not appoint counsel to aid him in seeking review in that court. At that stage he will have, at the very least, a transcript or other record of trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case. These materials, supplemented by whatever submission respondent may make *pro se,* would appear to provide the Supreme Court of North Carolina with an adequate basis for its decision to grant or deny review.

"We are fortified in this conclusion by our understanding of the function served by discretionary review in the North Carolina Supreme Court. The critical issue in that court, as we perceive it, is not whether there has been 'a correct adjudication of guilt' in every individual case, see *Griffin v. Illinois,* 351 U.S., at 18, but rather whether 'the subject matter of the appeal has significant public interest,' whether 'the cause involves legal principles of major significance to the jurisprudence of the State,' or whether the decision below is in probable conflict with a decision of the Supreme Court. The Supreme Court may deny certiorari even though it believes that the decision of the Court of Appeals was incorrect, see *Peaseley v. Virginia Iron, Coal & Coke Co.,* 282 N.C. 585, 194 S.E. 2d 133 (1973), since a decision which appears incorrect may nevertheless fail to satisfy any of the criteria discussed above. Once a defendant's claims of error are organized and presented in a lawyerlike fashion to the Court of Appeals, the justices of the Supreme Court of North Carolina who make the decision to grant or deny discretionary review should be able to ascertain whether his case satisfies the standards established by the legislature for such review.

"This is not to say, of course, that a skilled lawyer, particularly one trained in the somewhat arcane art of preparing petitions for discretionary review, would not prove helpful to any litigant able to employ him. An indigent defendant seeking review in the Supreme Court of North Carolina is therefore somewhat handicapped in comparison with a wealthy defendant who has counsel assisting him in every conceivable manner at every stage in the proceeding. But both the opportunity to have counsel prepare an initial brief in the Court of Appeals and the nature of discretionary review in the Supreme Court of North Carolina make this relative handicap far less than the handicap borne by the indigent defendant denied counsel on his initial appeal as of right in *Douglas*. And the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process. We think respondent was given that opportunity under the existing North Carolina system." *Id.* at 616–17.

We have quoted Justice Rehnquist's opinion at this length because it so appropriately describes the Wisconsin as well as the North Carolina appellate court system, and because we agree with its constitutional reasoning.

It is not the primary purpose of this court any longer merely to correct error in trial court proceedings—a function now largely met by the court of appeals—but instead to oversee and implement the statewide development of the law. *See In re Standards to Review Petitions to Appeal*, 85 Wis.2d xiii–xiv.[18] The court of appeals in

[18] "This court, having deemed it appropriate for the guidance of the Bar and the general public to set forth the standards it will apply in reviewing petitions to appeal from an adverse decision of the Court of Appeals filed pursuant to sec. 808.10 and Rule

Wisconsin now serves the primary "error-correcting" function in our new two-tiered appellate system. *See generally* Comment, *Petitions for Review by the Wisconsin Supreme Court,* 1979 Wis. L. Rev. 1176. Protection against improper refusal of court-appointed counsel to prosecute appeals at that level is adequately safeguard-

809.62, Stats., and this court noting that granting such petitions is a matter within its sound judicial discretion, hereby adopts the following guidelines, which are neither controlling nor limiting measures of such discretion:

"This court will grant a petition to appeal whenever three or more justices of this court vote to grant such petition and when any one of the following criteria are met:

"(A) A real and significant question of federal or state constitutional law is presented.

"(B) The petition demonstrates a need for this court to consider establishing, implementing or changing a policy within this court's authority.

"(C) A decision by this court will help develop, clarify or harmonize the law, and

"(1) The case calls for the application of a new doctrine rather than merely the application of well-settled principles to the factual situation; or

"(2) The question presented is a novel one, the resolution of which will have state-wide impact; or

"(3) The question presented is not factual in nature but rather is a question of law of the type that is likely to recur unless resolved by this court.

"(D) The Court of Appeals' decision is in conflict with controlling opinions of the United States Supreme Court or this court or other Court of Appeals' decisions.

"(E) The Court of Appeals' decision is in accord with opinions of this court or the Court of Appeals but due to the passage of time or changing circumstances, such opinions are ripe for re-examination.

"The above-stated guidelines are set forth to indicate what this court considers in reviewing petitions to appeal. It must be emphasized, however, that the presence in a case of any one or any combination of these factors is not an assurance that the petition to appeal will be granted. Nor is the apparent absence of such factors an assurance that the petition will be denied."

ed by secs. 809.32(1)–(3), Stats., which, as we have noted, substantially constitute the standards applied by this court (pursuant to *Anders, supra*) prior to creation of the court of appeals. Even though the procedure of subsection (4) governing "no merit" refusals by counsel to pursue subsequent access to this court is less detailed, it is, in light of those prior protections, permissibly so. Defendant's contention that an illiterate defendant is impermissibly prejudiced by having to write (or seek non-legal assistance in writing) his own reasons for review is met by the fact that a full prior review, with legal assistance, has already been afforded at the court of appeals. Moreover, in light of the functions of the two levels of courts and the purposes of our discretionary review, the fact that we as a matter of course appoint counsel for indigents to brief and argue cases to this court—as we did in the present case—does not constitutionally mandate our doing so for the petition process.[19]

We conclude that the Supreme Court's analysis in *Moffitt, supra,* of the due process and equal protection challenges to the North Carolina law govern the present case and establish the constitutionality of sec. 809.32(4), Stats., under federal constitutional standards. Because

[19] The defendant further argues that sec. 809.32(4) is constitutionally defective because it appears to contemplate that only issues raised at the court of appeals will be proper for consideration by this court, and that other matters—such as the adequacy of trial counsel in this case—not argued at the court of appeals will unfairly fail to be reviewed. As a general matter, it is true that we review decisions of the court of appeals rather than unreviewed trial court determinations. Of course we are not, however, precluded from considering any issue inhering in a case without such prior review. Indeed, in the present case, our disposition of the defendant's claim on the adequacy of trial counsel shows that such matters are not "lost" even if unargued and undecided by the court of appeals.

we find this reasoning persuasive in light of Wisconsin appellate structure and procedure, we decline the defendant's invitation to go beyond the federal constitutional holding and reach a contrary result based on independent state constitutional grounds. We emphasize, however, that absent a finding of no arguable merit under sec. 809.32(4), Stats., subsequent to a decision by the court of appeals, the public defender has the duty, which remains undiminished by our decision in the present case, to represent an indigent criminal defendant through the appellate process. *See, e.g.*, sec. 977.05(4)(j), Stats. In proceedings before this court, this includes the preparation of a petition for review and, if review is accepted by this court, briefing and oral argument.

In the present case, the record does not substantiate that the public defender "advise[d] the defendant of the reasons for his opinion" that review would be frivolous and without arguable merit, as required by (Rule) sec. 809.32(4), Stats. Because we granted review, and expressly indicated we would consider all issues raised *pro se* and others preserved and arguably meritorious, this was of no moment in the present case. However, we think it clear that to facilitate a defendant's preparation of *pro se* reasons for review, an appellate counsel declining to pursue review to this court should clearly explain why to the defendant, and we direct counsel to do so in the future. *See* Martineau and Malmgren, *Wisconsin Appellate Practice, supra*, sec. 2714(B), pp. 187–88.

We conclude, therefore, that sec. (Rule) 809.32(4), Stats., does not work an unconstitutional "deprivation" of counsel. We conclude also that the court of appeals did not err in affirming the defendant's two convictions against challenges of multiplicitous charging and improper identification procedures, and that the question,

if any, of adequacy of defendant's legal representation at trial is not now before this court.

*By the Court.*—Decision of the court of appeals affirmed.