STATE of Wisconsin,
Plaintiff-Respondent,

v.

David J. ROBERSON,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2003AP2802–CR. Oral argument March 21, 2006.
—Decided June 30, 2006.*

2006 WI 80

(Also reported in 717 N.W.2d 111.)

ABRAHAMSON, C.J., dissents.
BRADLEY, J., joins.

For the defendant-appellant-petitioner, there were briefs and oral argument by *Richard D. Martin,* assistant state public defender, Milwaukee.

For the plaintiff-respondent, the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. LOUIS B. BUTLER, JR., J. David J. Roberson ("Roberson") seeks review of a published decision by the court of appeals affirming both his judgment of conviction for delivery of a controlled substance (cocaine), in violation of Wis. Stat. §§ 961.16(2)(b)(1), 961.41(1)(cm)(1) and 939.05, and a decision denying his postconviction motion by the Honorable Elsa C. Lamelas, Milwaukee County. *State v. Roberson,* 2005 WI App 195, 287 Wis. 2d 403, 704 N.W.2d 302. Roberson contends that his trial counsel was ineffective for failing to file a motion to suppress two out-of-court identifications of Roberson by police officers when the identifications immediately followed a warrantless entry into Roberson's home, which Roberson asserts was illegal. Roberson asks this court to reverse the court of appeals and remand the matter for an evidentiary hearing, in accordance with *State v. Machner,* 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979), to address whether his trial counsel provided ineffective assistance.

¶ 2. The State asserts that Roberson failed to allege sufficient facts that would have satisfied Roberson's burden of making a specific offer of proof that the suppression motion would have succeeded, and therefore failed to establish that his counsel provided ineffective assistance. According to the State, the record conclu-

285

sively shows that a suppression motion would have failed because the police had probable cause to arrest Roberson before they entered his home and because the identifications made of him thereafter outside the home were admissible. In the alternative, the State contends that the warrantless entry was lawful because Roberson's mother consented to the entry, and because there were exigent circumstances to justify a warrantless entry. Finally, the State argues that Roberson could not prove prejudice, which is necessary to prove ineffective assistance of counsel, because the record conclusively shows that the subsequent in-court identifications were admissible.

¶ 3. We conclude that the in-court identifications of Roberson were properly admitted into evidence, regardless of whether the warrantless entry was illegal and regardless of whether the out-of-court identifications were inadmissible. We therefore conclude that Roberson's counsel's failure to move to suppress the out-of-court identifications did not prejudice his defense. We decline to address Roberson's challenge to the warrantless entry and out-of-court identifications immediately following the warrantless entry because exclusion of the out-of-court identifications would not alter the outcome of our analysis.[1] We therefore affirm the court of appeals.

I

¶ 4. The following facts are relevant to the in-court identification. At the time of trial, Detective Mark Wagner was a police officer with the City of Milwaukee

---

[1] *See State v. Manuel,* 2005 WI 75, ¶ 25 n.4, 281 Wis. 2d 554, 697 N.W.2d 811 (citing *Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938)) (only dispositive issues need be addressed).

for over ten years and was assigned to the Vice Control Division, Narcotics Unit, Rapid Enforcement Drug Offense (REDO) team. Wagner testified that at approximately noon on December 1, 2002, he was conducting a follow-up narcotics investigation in front of a liquor store on the northwest corner of 19th Street and State Street in Milwaukee, Wisconsin. While seated alone in a vehicle approximately one block from the liquor store, Wagner observed through his binoculars individuals entering and exiting the liquor store. He watched as two males left the side of a gray vehicle, approached other individuals entering and exiting the liquor store, and engaged in hand-to-hand transactions of some sort with those individuals. Wagner suspected the two men were selling drugs, and continued to observe their activities for approximately 20 minutes.

¶ 5. Wagner contacted Officer Michael Terrell, who was working undercover as part of the same REDO team, and informed him that there were two males that were possibly dealing narcotics and that he would like Terrell to attempt to purchase narcotics from them. He informed Terrell that the two individuals were black males and were wearing dark jeans and black jackets with gray stripes down the sleeves, and that one subject had longer wavy black hair with a headband around his ears, while the other one's hair was braided. Wagner directed Terrell to attempt to buy drugs from the two men.

¶ 6. After Wagner radioed Terrell, the two men entered the gray vehicle, which was parked on State Street facing westbound. The vehicle backed onto 19th Street and Wagner lost sight of the vehicle. When Terrell arrived on the scene, the two men had already left. According to Terrell, he approached a male, later identified as Lindsey Edwards, and indicated that he was

287

looking to purchase cocaine.[2] Edwards walked Terrell to a gray vehicle. The passenger side door of the gray vehicle opened as Terrell approached the vehicle. He saw a black male with wavy black hair and wearing a black jacket, matching the description that Wagner had given him, sitting on the passenger side of the vehicle. Edwards initiated contact with the man in the passenger seat of the vehicle, and then walked away. Terrell told the man in the passenger seat he had $25, and the man agreed to sell him three corner cuts of cocaine. Terrell gave him the $25[3] and Terrell was given the cocaine. According to Terrell's testimony, the exchange took approximately 20 seconds.

¶ 7. Upon leaving the scene of the buy, Terrell radioed Wagner, informing him that he bought cocaine from a man in the passenger side of a gray vehicle, that the man seated in the passenger seat had black wavy hair and was wearing a black and gray jacket, and that the car was parked between 18th and 19th Streets in a parking lot. This radio communication occurred approximately five minutes after Wagner had lost sight of the vehicle. Wagner notified the other officers in the area that Terrell had purchased narcotics from the suspects, who were in a gray, two-door vehicle between 18th and 19th Streets.

¶ 8. Shortly thereafter, the vehicle again came into Wagner's sight and he observed it make a series of turns, eventually parking in front of a residence approximately two blocks from where Wagner was parked. Wagner watched two males exit the vehicle and run

---

[2] Roberson and Edwards were tried together as co-defendants.

[3] The Milwaukee Police Department had recorded the serial numbers of the money used to purchase the cocaine.

onto the porch of the house located at 1011 North 21st Street. Wagner testified that he observed the men look around as they went up the porch, as if they had spotted the police. However, he testified that he did not know if they had seen the police. Wagner directed several officers involved in the investigation to establish a perimeter around the house. Wagner watched the front of the house and Terrell watched the back. Officers Mitchell Ward and Bodo Gajevic approached the front door and knocked on it. Roberson's mother, Cecilia Roberson, who also resided at the home, answered the door.

¶ 9. The officers entered Ms. Roberson's home and brought five men out of the house and onto the porch for Wagner to attempt to make an identification. It is unclear whether Ms. Roberson granted the police permission to enter her home. Wagner recognized one of the individuals as the driver of the car, but did not see the man who had been in the passenger seat among the five men on the porch. Terrell was also asked to view the five individuals brought outside the home to make an identification. Terrell did not recognize any of the several individuals originally brought to the porch.

¶ 10. According to Ward, Ms. Roberson then consented to a search of her house for more subjects. Ms. Roberson testified that she did not give the police permission to enter her home,[4] and that the officers entered her home when she turned her back to them to see if there was anyone else in the house.

---

[4] According to Cecilia Roberson's testimony, she did not give the police permission to enter her home, and she felt harassed and threatened by the police: "And they was sitting here actually bullying us around. And I thought that I could call the police on the police. So I dialed 911 on them." We do not address whether the officers' entry was illegal because it is immaterial to our analysis of the in-court identifications.

¶ 11. Several police officers reentered the home, found an individual, later identified as Roberson, in an upstairs bedroom and brought him onto the porch. On the porch, Detective Wagner positively identified Roberson as the man in the gray vehicle who he suspected of selling drugs outside the liquor store. Terrell also identified Roberson as the person from whom he had purchased the three corner cuts of cocaine. These identifications took place approximately 10 to 15 minutes after Terrell had purchased the cocaine.

¶ 12. Police officers searched the home but did not find any cocaine or the recorded bills used by Terrell for his drug purchase. The police found numerous jackets that were similar to the jacket worn by the man observed by Wagner outside the liquor store and by the man from whom Terrell purchased the cocaine. However, the police did not take any of these jackets into evidence. In addition, the police did not search the gray vehicle parked outside the residence from where Roberson was detained.

¶ 13. Roberson was arrested[5] and charged with delivery of a controlled substance (cocaine), in violation of Wis. Stat. §§ 961.16(2)(b)(1), 961.41(1)(cm)(1) and 939.05.[6]

¶ 14. A jury trial was held on February 10–13, 2003. The State presented no physical evidence linking Roberson to the crime and relied entirely on the identifications of Roberson by Wagner and Terrell. Wagner identified Roberson as one of the two individuals he

---

[5] The parties dispute whether Roberson was arrested inside his home or outside of his home after the officers identified him as the suspect. We do not address this issue because it is immaterial to our analysis of the in-court identifications.

[6] Edwards was also charged with the same offense.

observed for approximately 20 minutes standing by the gray vehicle outside the liquor store, and as the person who entered the passenger side of the gray vehicle.[7] Wagner testified that he is trained to carefully watch someone who is under surveillance, both because of the danger involved and so that he will be able to identify the suspect at a later time.

> Q: And do you see either one of those – the two individuals you say who you noticed by the gray car who were approaching these people and appearing to shake their hands or provide something to them, do you see either one of those two people here in court right now?
>
> A: Yes, I do.
>
> Q: Could you please tell the jury, point out where that person is seated and what color clothing they are wearing.
>
> A: Sure. He's seated at the defense table. He's wearing an orange, green, dark green sweater; and he has his hair braided.
>
> Attorney Licata: May the record reflect that the witness has just identified Defendant David Roberson.
>
> The court: It shall.
>
> . . .
>
> Q: Now there's another gentleman seated at the table with Mr. Roberson, the gentleman in the white sweater here next to his attorney, Ms. Stuller. Was that person the other person who was with Roberson on the street corner by the gray car?

---

[7] Wagner also testified that the other gentleman who had been with Roberson was not in the courtroom.

A: No, it was not.

. . .

Q: . . . I will refer to Mr. Roberson and Mr. Wright are the two people on the street corner who you see going up and shaking people's hands or making these transactions, correct?

A: Yes.

Q: And about how long do you see them do this kind of behavior for?

A: Approximately 20 minutes.

Q: So if you got there about 12:20 and it was about 5 minutes before you saw this behavior begin, is that what you testified to?

A: Yes

Q: And it goes on for about 20 minutes. We're now at about 12:45, in there?

A: Correct, somewhere in that area.

Q: And at this point, what, if anything, did you do?

A: I contacted Officer Michael Terrell, who already had known that I was going to go up in the area of 19th and State. And I notified him that there was two subjects that were possibly dealing narcotics and that I would like them to try to purchase narcotics from them.

Q: Did you provide Officer Terrell a description of these two people, Mr. Roberson and Mr. Wright?

A: Yes, I did.

Q: Do you recall what they were wearing and what description you provided? And if you need to refer to your report at any point, just tell the judge you'd like to do that.

292

A: Okay. Both the subjects were wearing black jackets, pretty similar jackets, with gray stripes down both sleeves. One subject had wavy hair. Mr. Roberson had wavy, longer wavy black hair. Mr. Wright had braided hair with some sort of design pattern it seemed like was in it. Both were wearing dark blue jeans, and Mr. Roberson had some type of blue or black ear—it looked like a headband but that went around the ears.

Q: Did you have any trouble—there was nothing concealing his face, was there?

A: No.

Q: And you were able to look at him for about 20 minutes before you called Officer Terrell.

A: Yes.

Q: And are you trained when you're making this surveillance to be carefully watching someone in terms of being able to identify them?

A: Yes, we are.

. . .

Q: And in this case that surveillance was, the 20 minutes, was that continuous observation?

A: Yes.

Q: Mr. Roberson didn't leave your sight for 10 minutes and come back; he was out there the whole time?

A: Yes, he was standing on the corner or walking in front of the store the whole time.

¶ 15. During trial, Terrell similarly identified Roberson as the person in the passenger seat in the gray car from whom he purchased cocaine.

293

Q: Do you see either of those two people who were in that gray car as you approached with Mr. Edwards do you see either of those two people in this courtroom right now?

A: Yes, sir.

Q: Could you please tell the jury where that person is seated and what they're wearing now.

A: He's sitting next to the gentleman with the tie, and he has on a green sweater with orange stripes.

Mr. Licata: May the record reflect the witness just identified Defendant Roberson?

The court: It will.

¶ 16. Terrell also testified about his interaction with Roberson:

Q: Now when you got to the gray car, what happened?

A: As we got to, as we approached the car, the passenger door opened.

Q: How many people were in that car that you saw?

A: There were two people in the car.

Q: Where were they sitting in the gray car?

A: One was in the driver's seat, and one was in the passenger's seat.

. . .

Q: And at that point you see Mr. Roberson for the first time?

A: Yes sir.

294

Q: And did Mr. Roberson match the description that you had been given of one of the two people who, by Officer Wagner the people he had seen?

A: Yes, sir.

Q: And you testified earlier the description had been wavy hair and the black jacket?

A: Yes, sir.

Q: And that's how Mr. Roberson looked.

A: Yes, sir.

. . .

Q: When you saw Mr. Roberson and his physical description, what did you think?

A: It, it matched the description.

. . .

Q: Do you speak to Roberson at this point, or does Roberson speak to you; what happens?

A: I speak to him.

Q: What do you say to Mr. Roberson?

A: I told him I had $25.

Q: And what did he say to you if anything?

A: He said that was fine. I don't remember his exact words, but he agreed that 25 was good for three.

. . .

Q: Now when you told Roberson, I have $25, and he said, That's fine, what happened then?

A: I gave him the money.

Q: And it was Roberson who took the money.

A: Yes, sir.

Q: Not the guy in the driver's seat.

A: No.

Q: Did you get a look at the guy in the driver's seat at this point or not?

A: From an angle I could see that he was a black, a black male; and I could see his complexion and that he had on a black jacket, jeans. But that's, that's about it. I really couldn't – I wouldn't be able to identify him.

Q: Do you recall if his complexion was light or dark?

A: Yeah, it was a dark complexion.

Q: And would you describe Mr. Roberson's complexion as light or dark?

A: I would say he's light to medium complexion.

¶ 17. Roberson's theory of defense was that the officers had misidentified him as the suspect. He provided alibi witnesses that testified that he was inside his home when the drug transaction occurred. Upon his conviction, Roberson stated that he had been "found guilty of something I didn't do."

¶ 18. A unanimous jury convicted Roberson of one count of delivery of cocaine.[8] Roberson was sentenced to imprisonment for 60 months, including initial confinement for 30 months and extended supervision for 30 months.

¶ 19. Roberson filed a postconviction motion, alleging that he was denied effective assistance of counsel because his trial counsel failed to challenge the warrantless entry into his home and the subsequent out-of-court identifications of Roberson by Wagner and

---

[8] The jury was unable to reach a verdict in Edwards' case. Judge Lamelas granted the State's motion to dismiss.

Terrell.[9] In his postconviction motion, Roberson asserted that the out-of-court identifications were tainted by the illegal arrest.

[9] On re-direct, Wagner testified about his out-of-court identification.

> Q: The identification you made of Mr. Roberson when he was brought out of the house, came out of the house at 1011 North 21st Street, that identification was made, if I'm adding up here the time schedule correctly, within minutes of you seeing Mr. Roberson and Wright run into that house.
>
> A: Yes.
>
> Q: And that all occurred shortly after you had finished the surveillance of Mr. Roberson and Wright as they were doing what they were doing in front of that liquor store that afternoon –
>
> A: Correct.
>
> Q: — right? So you were not simply identifying Mr. Roberson here today a couple of months later; you identified him right there minutes after the incident.
>
> A: Yes.
>
> Q: And that identification was made after you watched him for approximately 25 minutes through the binoculars very carefully, wasn't it?
>
> A: Yes.

Officer Terrell similarly testified about his out-of-court identification of Roberson moments after the drug buy:

> Q: And when you went around and looked at the front, at people on the front porch, about how many people were out there that you were to view if you knew?
>
> A: It was several. I don't know the exact number, but it was several individuals.
>
> Q: And did you recognize anybody who was out there?
>
> A: Originally, no.
>
> Q: The – Mr. Roberson, the person who sold you the drugs, you didn't see him out on that porch when you first went around?
>
> A: No, sir.

¶ 20. The circuit court denied Roberson's post-conviction motion without an evidentiary hearing. The

Q: And Mr. Edwards wasn't there, was he?

A: No, sir.

Q: Did there come a point where somebody else was brought or came out of that house who you did recognize?

A: Yes, sir.

Q: Who was that?

A: It was the defendant, Mr. Roberson.

Q: The gentleman who you have already identified here in the court —

A: Yes, sir.

Q: — who sold you the drugs.

A: Yes, sir.

Q: And about how long after you first went out there, looked at the people and said, not one of them, about how long was it before Mr. Roberson came out of that house?

A: It was just a couple of minutes.

Q: When you saw him, did you immediately recognize him?

A: Yes, sir.

Q: Was there any doubt in your mind then or today that he was the person who sold you the drugs as you've testified to?

A: No, sir.

Q: And this identification you made of him occurred about how many minutes after the actual drug buy was made between you and him?

A: I would say maybe 10 to 15 minutes.

Q: Now, do you recall if he – did he still have the wavy hair?

A: Yes, sir.

Q: Did you recall if he was wearing the same black jacket that he had on when he sold you the drugs?

A: No, sir, he did not have on a black jacket.

circuit court concluded that there was no need for an evidentiary hearing because it had already heard testimony from Ms. Roberson and the police officers and that an evidentiary hearing would provide no new evidence. The circuit court judge reasoned that she would have found Ms. Roberson less credible given the inconsistencies between her testimony and Ward's testimony, as well as Ms. Roberson's "evident partiality towards her son." The circuit court concluded that there was no reasonable probability that the failure of Roberson's counsel to file a suppression motion would have altered the result of the proceedings.

¶ 21. The court of appeals initially reversed the circuit court, finding that the trial court erred by failing to hold a hearing in accordance with *Machner,* 92 Wis. 2d 797. *State v. Roberson,* No. 2003AP2802–CR, unpublished slip op. (Wis. Ct. App. Sept. 30, 2004). However, the State filed a motion to reconsider and the court of appeals withdrew its initial opinion and then affirmed the circuit court, finding that even if Roberson's arrest was illegal, the identifications of Roberson were admissible. The court of appeals concluded that the police had probable cause to arrest Roberson, independent of the illegal entry. *Roberson,* 287 Wis. 2d 403, ¶¶ 21–23. Accordingly, the court found that Roberson's counsel's alleged ineffectiveness did not prejudice the outcome of the case. *Id.,* ¶ 24.

¶ 22. Roberson petitioned this court for review, which we granted.

II

¶ 23. The present case requires us to determine whether Roberson's counsel was ineffective. Under both the United States and Wisconsin Constitutions,

299

criminal defendants are guaranteed the right to counsel. U.S. Const. amends. VI, XIV; Wis. Const. art. I, § 7. This right includes the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984) (citing *McMann v. Richardson,* 397 U.S. 759 (1970)); *State v. Trawitzki,* 2001 WI 77, ¶ 39, 244 Wis. 2d 523, 628 N.W.2d 801. The standard for determining whether counsel's assistance is effective under the Wisconsin Constitution is identical to that under the federal constitution. *State v. Thiel,* 2003 WI 111, ¶ 18 n.7, 264 Wis. 2d 571, 665 N.W.2d 305 (citing *State v. Sanchez,* 201 Wis. 2d 219, 235–36, 548 N.W.2d 69 (1996)).

¶ 24. To establish the denial of a defendant's constitutional right to the effective assistance of counsel at trial, the defendant bears the burden of proving that counsel's performance was deficient and that such performance prejudiced the defense. *Strickland,* 466 U.S. at 687; *Thiel,* 264 Wis. 2d 571, ¶¶ 18–20. In reviewing a claim of ineffective assistance of counsel, "we grant deference only to the circuit court's findings of historical fact. We review de novo the legal questions of whether deficient performance has been established and whether it led to prejudice rising to a level undermining the reliability of the proceeding." *Thiel,* 264 Wis. 2d 571, ¶ 24.

¶ 25. Whether an in-court identification has been tainted by prior illegal activity is a question of constitutional fact, which is a mixed question of fact and law and requires a two-part inquiry. *See State v. McMorris,* 213 Wis. 2d 156, 164–66, 570 N.W.2d 384 (1997) (citing *State v. Anderson,* 165 Wis. 2d 441, 447–48, 477 N.W.2d 277 (1991)). We first examine the circuit court's histori-

cal or evidentiary findings of fact, which we will not reverse unless clearly erroneous. *Id.* at 165. We then examine whether the facts satisfy the relevant constitutional standard, which is reviewed independently from the circuit court's and court of appeals' analyses. *Id.*

¶ 26. Roberson's claims regarding the warrantless entry and the identification evidence must also be considered within his claim of ineffective assistance of counsel. *See State v. Anderson,* 2006 WI 77, ¶ 48, 291 Wis. 2d 673, 717 N.W.2d 74; *State v. Cleveland,* 118 Wis. 2d 615, 618 n.1, 348 N.W.2d 512 (1984).

### III

¶ 27. Roberson contends that his counsel was ineffective for failing to move to suppress the out-of-court identifications as the fruit of an illegal, warrantless entry. Roberson also asserts that the circuit court erred in denying him a hearing to prove his counsel was ineffective, as required under *Machner,* 92 Wis. 2d 797.

¶ 28. Wisconsin applies the two-part test described in *Strickland,* 466 U.S. 668, for evaluating claims of ineffective assistance of counsel. *State v. Johnson,* 153 Wis. 2d 121, 126, 449 N.W.2d 845 (1990). To prevail on an ineffective-assistance-of-counsel claim, the defendant must prove that his or her counsel's performance was deficient and that the deficiency prejudiced his or her defense. *Id.* at 127. In this analysis, courts may decide ineffective assistance claims based on prejudice without considering whether the counsel's performance was deficient. *Id.* at 128 (quoting *Strickland,* 466 U.S. at 697).

301

¶ 29. To establish prejudice, the defendant must show there is a reasonable probability that, but for counsel's error(s), the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. *Thiel*, 264 Wis. 2d 571, ¶ 20; *Strickland*, 466 U.S. at 694. "The focus of this inquiry is not on the outcome of the trial, but on the reliability of the proceedings." *Thiel*, 264 Wis. 2d 571, ¶ 20 (citation omitted). *See also State v. Love*, 2005 WI 116, ¶ 30, 284 Wis. 2d 111, 700 N.W.2d 62.

¶ 30. In the present case, Roberson claims that the warrantless entry was illegal, and his ineffective assistance of counsel claim is rooted in his counsel's failure to move to suppress the out-of-court identifications that arose out of the warrantless entry.[10] Yet, this case actually involves two separate identifications: the officers' out-of-court and in-court identifications.[11] For there to exist a reasonable probability of a different outcome

---

[10] We note that the State offered no physical evidence linking Roberson to the crime. The State's case against Roberson was premised entirely upon the identifications by Wagner and Terrell.

[11] We note that Roberson only challenged the warrantless entry and the out-of-court identifications and did not raise the issue of the in-court identifications in his petition or briefs to this court. In its response brief, the State asserted that the in-court identification was admissible. The court of appeals did not address the in-court identification. At oral argument, Roberson asserted that the State would have the opportunity to show that there existed an independent source for the in-court identification at the postconviction motion hearing. The State asserted that the record sufficiently demonstrated that the State met this burden.

in this case, we would need to determine that the warrantless entry was illegal, and that both the out-of-court and in-court identifications were improperly admitted into evidence at trial.

¶ 31. Assuming that the warrantless entry was illegal[12] and the out-of-court identifications were inad-

This court generally does not address issues that are inadequately briefed, *Milwaukee Metropolitan Sewerage Dist. v. City of Milwaukee,* 2005 WI 8, ¶ 87 n.30, 277 Wis. 2d 635, 691 N.W.2d 658. However, as we have previously recognized, under certain circumstances "additional briefs would simply delay the court's determination and increase legal fees without benefiting the decision-making process. We acknowledge the courts' abilities to identify correctly those matters calling for additional briefing and those within the authority of the court to correct without further assistance from the parties." *Bartus v. DHSS,* 176 Wis. 2d 1063, 1072–1073, 501 N.W.2d 419 (1993).

[12] A nonconsensual, warrantless search of one's home is presumed to be illegal under the Fourth Amendment. *Payton v. New York,* 445 U.S. 573 (1980). Police may lawfully enter a home without a warrant, however, if they have probable cause and there exist exigent circumstances. *State v. Richter,* 2000 WI 58, ¶ 29, 235 Wis. 2d 524, 612 N.W.2d 29. This State has recognized four categories of exigent circumstances:

 1) hot pursuit of a suspect,

 2) a threat to the safety of a suspect or others,

 3) a risk that evidence will be destroyed, and

 4) a likelihood that the suspect will flee.

*Id.* (citation omitted).

In addition, the Fourth Amendment is not violated by a warrantless search for which consent is freely and voluntarily given. *State v. Phillips,* 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998). Although the parties dispute whether Ms. Roberson gave consent to enter her home (she called the 911 police dispatcher to complain about the behavior of the officers at her

missible,[13] we conclude that Roberson cannot meet the prejudice prong of the *Strickland* test because the in-court identifications were properly admitted.

¶ 32. The admissibility of an in-court identification depends upon whether that identification evidence has been tainted by illegal activity. In general, evidence must be suppressed as fruit of the poisonous tree, "if

home), the trial court determined that Ms. Roberson was less credible than the officers and, therefore, that she did, in fact, give consent.

Because we assume for purposes of this analysis that the warrantless entry was illegal, we decline to decide whether the police had probable cause, nor whether any of the four recognized categories of exigent circumstances existed here, and we make no judgment as to whether the circuit court's factual finding regarding consent is supported by the record.

[13] Roberson contends that the out-of-court identification should be suppressed because it was the fruit of an illegal, warrantless entry.

Because the admissibility of the in-court identification is determinative in this case, we assume for purposes of this analysis that the out-of-court identification was inadmissible, and therefore do not review whether the out-of-court identification was inadmissible as the fruit of an illegal warrantless entry.

In addition, we recognize that in *State v. Dubose,* 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, we concluded that "evidence obtained from an out-of-court showup is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary." *Id.,* ¶ 33. We further explained that a showup would not be deemed necessary "unless the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array." *Id.* Because the admissibility of the in-court identification is determinative, and because this issue was neither briefed nor argued, we need not determine whether the *Dubose* decision should be applied retroactively to this case.

304

such evidence is obtained 'by exploitation of that illegality.' " *State v. Knapp*, 2005 WI 127, ¶ 24, 285 Wis. 2d 86, 700 N.W.2d 899 (citation omitted); *New York v. Harris*, 495 U.S. 14, 19 (1990).

¶ 33. The remedy for an illegal warrantless search may be the suppression of any identification evidence that has been tainted. However, an illegal search is irrelevant to the admissibility of any evidence that does not actually flow from that illegal activity. *United States v. Crews*, 445 U.S. 463, 475 (1980). As the United States Supreme Court has concluded, "[t]he exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; *it does not reach backward to taint information that was in official hands prior to any illegality.*" *Id.* (emphasis added).

¶ 34. An in-court identification is admissible, therefore, if the court determines that the identification is based on an independent source. *McMorris*, 213 Wis. 2d at 166–68 (citations omitted); *State v. Walker*, 154 Wis. 2d 158, 188, 453 N.W.2d 127 (1990) (citing *Crews*, 445 U.S. 463). *See also Powell v. State*, 86 Wis. 2d 51, 65–66, 271 N.W.2d 610 (1978). The primary question is whether "the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Walker*, 154 Wis. 2d at 186 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). To be admissible, the in-court identification must be made "by means sufficiently distinguishable to be purged of the primary taint." *McMorris*, 213 Wis. 2d at 167 (quoting *United States v. Wade*, 388 U.S. 218, 241 (1967); *Wong Sun*, 371 U.S. at 488). In other words, the in-court identification must rest on an independent

305

recollection of the witness's initial encounter with the suspect. *Walker,* 154 Wis. 2d at 188.

■

¶ 35. Ordinarily, an analysis of the admissibility of an in-court identification shifts to the State the heavy burden of establishing by clear and convincing evidence that the in-court identification was not tainted by the illegal activity.[14] *Walker,* 154 Wis. 2d at 186; *Powell,* 86 Wis. 2d at 65; *Holmes v. State,* 59 Wis. 2d 488, 496, 208 N.W.2d 815 (1973). However, the question of the admissibility of the in-court identifications in this case arises as part of an ineffective assistance of counsel claim. *See Anderson,* 291 Wis. 2d 673, ¶ 48. In an ineffective assistance of counsel claim, *Strickland* "places the burden on the defendant to affirmatively prove prejudice." *Johnson,* 153 Wis. 2d at 129. *Compare*

---

[14] This court has previously concluded that the test established in *United States v. Wade,* 388 U.S. 218 (1967), is the appropriate test for reviewing the admissibility of an in-court identification. *State v. McMorris,* 213 Wis. 2d 156, 167, 570 N.W.2d 384 (1997).

The *Wade* test establishes seven factors for the court to consider in determining whether an in-court identification is sufficiently removed from the primary taint. *Id.* at 168 (citation omitted). Courts should consider the following factors:

> (1) the prior opportunity the witness had to observe the alleged criminal activity; (2) the existence of any discrepancy between pre-lineup description and the accused's actual description; (3) any identification of another person prior to the lineup; (4) any identification by picture of the accused prior to the lineup; (5) failure to identify the accused on a prior occasion; (6) the lapse of time between the alleged crime and the lineup identification; and (7) the facts disclosed concerning the conduct of the lineup.

*Id.* (citing *Wade,* 388 U.S. at 241); *State v. Walker,* 154 Wis. 2d 158, 188, 453 N.W.2d 127 (1990); *State v. Mosley,* 102 Wis. 2d 636, 656, 307 N.W.2d 200 (1981).

306

*Chapman v. California,* 386 U.S. 18, 24, (1967) with *Strickland,* 466 U.S. at 694. *See also State v. Harvey,* 2002 WI 93, ¶ 41, 254 Wis. 2d 442, 647 N.W.2d 189 ("[O]rdinarily, the one who benefits from the error must prove harmlessness, but in an ineffective assistance of counsel claim, the defendant must prove prejudice.") (citation omitted). In determining whether the defendant has met his or her burden of proving prejudice, the reviewing courts are required to consider the totality of the evidence before the trier of fact. *Johnson,* 153 Wis. 2d at 129–30.

¶ 36. The in-court identifications by Wagner and Terrell were based on their independent recollections of their observations of and encounters with Roberson outside the liquor store prior to the drug transaction, as well as during the drug transaction, and were not related to the identification of Roberson outside of his home. This determination finds ample support in the record. Both Wagner and Terrell's in-court identifications followed their testimony regarding their observations of Roberson in full daylight outside the liquor store and during the drug buy. Their in-court identifications were made prior to any testimony about the out-of-court identifications. These in-court identifications occurred less than three months after the officers' observations of and interaction with Roberson.

¶ 37. Both Terrell and Wagner worked for the City's Rapid Enforcement Drug Offense team and had been trained to carefully observe suspects' facial features in order to be able to identify suspects by their face. Wagner had worked as a police officer with the City of Milwaukee for over ten years and Terrell had worked as a police officer with the City for over four years.

¶ 38. Wagner's trial testimony reveals that he had sufficient opportunity to view Roberson. Wagner ob-

served two men, later identified as Roberson and Wright, outside the liquor store for over 20 minutes and watched the men get into a gray car. Wagner testified that he used binoculars to view Roberson and that his view of Roberson outside the liquor store was unobstructed and continuous and that he had no trouble seeing the suspects' faces and clothing. Although Wagner lost sight of the car for a brief amount of time, when Wagner regained sight of the car, he watched the car make a series of turns and park in front of a house, later identified as Roberson's home. He then observed Roberson and Wright exit the car and enter Roberson's home. Moments later, Wagner was asked to view five individuals brought onto the porch of Roberson's home. Wagner informed the officers that the suspect was not on the porch and instructed them to search the house because the main suspect was still inside the residence.

¶ 39. Terrell's testimony reveals that he had sufficient opportunity to observe Roberson during the drug buy. Terrell testified that when he approached the gray car to initiate the drug purchase, a man seated in the passenger seat, later identified as Roberson, matched the description he had been given by Wagner. Terrell told Roberson that he had $25 and the suspect agreed to sell him three corner cuts of cocaine. Terrell handed the money directly to Roberson. At trial, Terrell explained that although he had a clear view of Roberson in the passenger seat, he had been unable to view the driver and therefore could not identify the driver of the car. In addition, like Wagner, Terrell testified that he did not recognize the person who had sold him the cocaine among the first five individuals who were brought onto the porch of Roberson's home.

¶ 40. We conclude that the officers' capacity to identify Roberson during trial neither resulted from

nor was biased by the alleged unlawful police conduct. Even assuming that the entry was illegal and the subsequent out-of-court identifications were inadmissible, the police acquired nothing from the illegal entry or the subsequent out-of-court identifications that was relevant to their ability to identify Roberson at trial, and there is no evidence to show that the subsequent in-court identification testimony was somehow tainted.

¶ 41. Because the record in this case clearly reveals that neither the warrantless entry, nor the subsequent out-of-court identifications, contaminated the officers' ability to provide the jury with accurate identification testimony about the officers' previous observations of and encounters with Roberson, we conclude that the in-court identifications were not the proverbial "fruit of the poisonous tree."

IV

¶ 42. We next address whether the circuit court erred in·denying Roberson a hearing on his ineffective assistance of counsel claim. Under *Machner,* "a hearing may be held when a criminal defendant's trial counsel is challenged for allegedly providing ineffective assistance." *Thiel,* 264 Wis. 2d 571, ¶ 2 n.3.[15]

¶ 43. However, the circuit court has the discretion to deny the postconviction motion without a *Machner* hearing "if the motion fails to allege sufficient facts to raise a question of fact, presents only conclusory alle-

---

[15] "At the hearing, trial counsel testifies as to his or her reasoning on challenged action or inaction." *State v. Thiel,* 2003 WI 111, ¶ 2 n.3, 264 Wis. 2d 571, 665 N.W.2d 305.

gations, *or if the record conclusively demonstrates that the defendant is not entitled to relief." State v. Curtis,* 218 Wis. 2d 550, 555 n.3, 582 N.W.2d 409 (Ct. App. 1998) (emphasis added) (citing *State v. Bentley,* 201 Wis. 2d 303, 313, 548 N.W.2d 50 (1996)).

¶ 44. Because we conclude that the record sufficiently establishes that Roberson was not prejudiced by his counsel's actions, we further conclude that the circuit court did not err in denying Roberson a hearing on his postconviction motion alleging ineffective assistance of trial counsel in accordance with *Machner,* 92 Wis. 2d 797.

## V

¶ 45. We conclude that the in-court identifications of Roberson by Detective Wagner and Officer Terrell were properly admitted into evidence, regardless of whether the warrantless entry was illegal, and regardless of whether the out-of-court identifications were inadmissible. We further conclude that Roberson's counsel's failure to move to suppress the out-of-court identifications did not prejudice his defense. We therefore affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 46. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). The issue in the present case is whether the defendant should get a hearing (a *Machner* hearing)[1] on his motion to vacate the judgment of conviction on the ground of ineffective assistance of counsel. He claims defense counsel was ineffective in failing to challenge the officers' testimony regarding the out-of-court iden-

[1] *See State v. Machner,* 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

tifications and in failing to object to the in-court identifications as tainted by the out-of-court identifications.[2]

¶ 47. To get a *Machner* evidentiary hearing, an accused must make a sufficient showing on the two elements of ineffective assistance of counsel: (1) counsel's performance was deficient;[3] and (2) counsel's deficient performance was prejudicial.[4] The defendant need not prove either of these prongs at the motion stage of the proceeding. The defendant need show only that he should get an evidentiary hearing on the issues.

¶ 48. A circuit court determines as a matter of law "whether the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to

---

[2] This case comes to this court after the court of appeals, upon motion for reconsideration by the State, withdrew its original opinion in favor of the defendant and issued a new opinion upholding the denial of the defendant's request for a *Machner* hearing. *See State v. Roberson,* 2005 WI App 195, 287 Wis. 2d 403, 704 N.W.2d 302; *State v. Roberson,* No. 2003AP2802–CR, unpublished slip op. (Wis. Ct. App. Sept. 30, 2004), (withdrawn by order of the court of appeals Oct. 21, 2004).

[3] *Strickland v. Washington,* 466 U.S. 668, 687 (1984) ("First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.").

[4] *State v. Thiel,* 2003 WI 111, ¶ 20, 264 Wis. 2d 571, 665 N.W.2d 305 (quoting *Strickland,* 466 U.S. at 694) ("In order to demonstrate that counsel's deficient performance is constitutionally prejudicial, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' ").

relief. . . . If the motion raises such facts, the circuit court must hold an evidentiary hearing. However, if the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing."[5]

¶ 49. Whether the motion sufficiently alleges facts which, if true, would entitle an accused to relief is a question of law to be determined by this court independently of the circuit court or court of appeals.[6]

¶ 50. The majority opinion first decides whether defense counsel's performance (even if deficient in failing to object to the out-of-court identifications) prejudiced the defendant. The majority opinion then declares that even if defense counsel erred in failing to challenge the out-of-court identifications, the error was harmless error and the court need not examine whether counsel fell below an objective standard of reasonableness for an attorney with regard to the out-of-court identifications.[7] Under the majority opinion's assump-

---

[5] *State v. Allen,* 2004 WI 106, ¶ 9, 274 Wis. 2d 568, 682 N.W.2d 433 (citing *State v. Bentley,* 201 Wis. 2d 303, 309–10, 548 N.W.2d 50 (1996) and *Nelson v. State,* 54 Wis. 2d 489, 497, 195 N.W.2d 629 (1972)) (citations omitted).

[6] *State v. Bentley,* 201 Wis. 2d 303, 309–11, 548 N.W.2d 50 (1996).

[7] *Strickland,* 466 U.S. at 687–88.

In *Strickland,* the United States Supreme Court explained the objective standard of reasonableness for an attorney in a bit more detail: "[A] guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not 'a reasonably competent attorney' and the advice was not 'within the range of competence demanded of attorneys in criminal cases.' " *Strickland,* 466 U.S. at 687.

tions, I conclude that the admission of the out-of-court identifications was prejudicial because at trial the State tied together the out-of-court and in-court identifications and used the out-of-court identifications to bolster the in-court identifications.

¶ 51. The majority opinion then concludes that the in-court identifications were properly admitted into evidence, regardless of whether the warrantless entry into the house was illegal and regardless of whether the out-of-court identifications were inadmissible. I disagree and conclude that the defendant is entitled to a hearing on whether the in-court identifications were tainted.

¶ 52. The majority opinion recognizes that if defense counsel erred in failing to challenge the in-court identifications, this deficient performance was prejudicial. The majority opinion treats the admissibility of the in-court identification as determinative of the case.[8]

¶ 53. I shall first discuss whether the assumed deficient performance on the part of defense counsel in not challenging the out-of-court identifications was prejudicial error. In contrast with the majority opinion, I conclude that it was. I then turn to whether the defendant's motion alleges sufficient material facts regarding both the out-of-court identifications and the in-court identifications that, if true, would entitle the defendant to a *Machner* hearing on the deficient performance of defense counsel. I conclude that the motion is sufficient to entitle the defendant to a *Machner* hearing.

I

¶ 54. The majority opinion assumes for the purposes of review, and I agree, that defense counsel erred by failing to object to the out-of-court identifications

---

[8] Majority op., ¶ 31 n.13.

and that the out-of-court identifications should have been suppressed. The majority opinion then concludes that the record conclusively shows that the defendant was not prejudiced by defense counsel's failure to challenge the out-of-court identifications.[9] Here is where I part with the majority opinion.

¶ 55. If the out-of-court identifications had been suppressed, the only evidence supporting the conviction would have been the in-court identifications. Because the State tried the case by bolstering the in-court identification with the out-of-court identifications, I conclude (assuming as did the majority opinion that the in-court identifications were admissible and that the out-of-court identifications were erroneously admitted) that admission of the out-of-court identifications was prejudicial error.

¶ 56. This case turns on the identifications of the defendant. The identifications are the only evidence tying the defendant to the crime charged. The defendant's defense was that he did not do it and was a victim of misidentification. The only evidence in the entire case tying the defendant to the drug offense was the officers' in-court and out-of-court identifications.[10] No drugs or marked money were found on the defendant's person or in the house from which he was removed a short time after the drug transaction.

¶ 57. The majority opinion treats the admissibility of the in-court identifications alone as determinative of the case.[11] Yet during trial the State tied the in-court

[9] Majority op., ¶¶ 3, 40–41.

[10] Majority op., ¶ 14.

[11] Majority op., ¶ 31 n.13.

identification to the out-of-court identifications to convince the jurors that the in-court identification was reliable and persuasive.

¶ 58. The State's direct examination of Detective Wagner emphasized the out-of-court identifications outside the mother's home and used them to bolster the in-court identification:

Q: ... The identification you made of Mr. Roberson when he was brought out of the house ... was made, if I'm adding up here the time schedule correctly, within minutes of you seeing Mr. Roberson ... run into that house.

A: Yes.

Q: And that all occurred shortly after you had finished the surveillance of Mr. Roberson ... in front of that liquor store that afternoon—

A: Correct.

Q: —right? So you were not simply identifying Mr. Roberson here today a couple of months later; you identified him right there minutes after the incident.

A: Yes.

Q: And that identification was made after you watched him for approximately 25 minutes through the binoculars very carefully, wasn't it?

A: Yes.

¶ 59. During opening and closing statements the State emphasized the out-of-court identifications (which the majority opinion assumes should have been suppressed), again to bolster the in-court identifications.

315

¶ 60. In the opening argument, the assistant district attorney stressed that the two officers readily identified the defendant outside of his mother's house.

¶ 61. The State placed similar emphasis on the out-of-court identifications outside the mother's home in closing arguments, underscoring for the jury the importance of these out-of-court identifications. Specifically, the assistant district attorney stated that the issue in the case was not whether the in-court identification was reliable but, rather, whether the contemporaneous police report and out-of-court identifications were reliable.

¶ 62. The assistant district attorney said: "You write a report close in time, you make an ID and put it down in the report. The issue is; did he identify correctly [the defendant] shortly after the incident based on what he saw and did."

¶ 63. If the out-of-court identifications were inadmissible, the only remaining evidence was the in-court identifications, which the State at trial significantly entangled with the out-of-court identifications that should have been suppressed. Considering all the factors in *State v. Billings,* 110 Wis. 2d 661, 668–70, 329 N.W.2d 192 (1983), such as the frequency of the error, the nature of the State's case, the defense presented at trial, whether the evidence was duplicative of other evidence, and any other factors that may help reveal whether the admission of evidence was prejudicial,[12] it

---

[12] In *State v. Billings,* 110 Wis. 2d 661, 668, 329 N.W.2d 192 (1983), this court warned of the problems with upholding a conviction based on the strength of untainted evidence when there is also tainted evidence presented at trial:

The impact of the erroneously admitted evidence on the jurors cannot be assessed either by looking at the erroneously admitted

is clear that the in-court identifications were chained at trial to the out-of-court identifications, which should have been suppressed.

¶ 64. My conclusion, unlike that of the majority opinion, is that if there was error in admitting the out-of-court identifications, the error was prejudicial, even if the in-court identifications were admissible.

## II

¶ 65. I now turn to whether the defendant's motion to vacate the conviction on the grounds of ineffective assistance of counsel makes a sufficient showing that counsel's performance was deficient (by failing to challenge the officers' testimony regarding the out-of-court identifications outside the mother's home and by failing to object to the in-court identifications as tainted by the out-of-court identifications), entitling him to an evidentiary hearing. Our task is not to determine whether defense counsel's performance was deficient; it is to determine whether the motion is sufficient to entitle the defendant to an evidentiary hearing.

¶ 66. An attorney's performance is not deficient for failing to pursue a suppression motion that lacks merit. Conversely, an attorney's performance may be deficient for failing to pursue a suppression motion that has merit. I conclude that the defendant's claims of

---

evidence in isolation or by looking at the evidence unaffected by the error . . . in isolation to determine whether it is sufficient to support the conviction. The court cannot, as the United States Supreme Court has admonished, give too much emphasis to "overwhelming evidence" of guilt. Emphasizing the sufficiency of untainted evidence independently of the erroneously admitted evidence creates a danger of substituting the court's judgment for the jury's.

(quoting *Chapman v. California,* 386 U.S. 18, 23 (1967)).

ineffective assistance of counsel justify an evidentiary *Machner* hearing to determine whether a suppression motion should have been made.

¶ 67. One claim of ineffective assistance of counsel is counsel's failure to challenge the in-court identifications as tainted by the inadmissible out-of-court identifications. The State's position is that the in-court identifications were not tainted by the out-of-court identifications but were based independently on the officers' observations of the defendant's drug dealing activities, which the officers had observed earlier.

¶ 68. When an out-of-court identification of an accused is inadmissible, an in-court identification by the same individual nevertheless may be admissible "if the State carries the burden of showing 'by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the [inadmissible identification].' "[13] An in-court identi-

---

[13] *State v. Dubose,* 2005 WI 126, ¶ 38, 285 Wis. 2d 143, 699 N.W.2d 582; *State v. McMorris,* 213 Wis. 2d 156, 167, 570 N.W.2d 384 (1997) (quoting *United States v. Wade,* 388 U.S. 218, 240 (1967)).

In a similar case in which an undercover police officer identified a defendant both in court and out of court, and the out-of-court identification was inadmissible, the New York Court of Appeals concluded that the State had failed to show by clear and convincing evidence that the in-court identification was not tainted by the out-of-court identification. *People v. Gethers,* 654 N.E. 2d 102, 104–05 (N.Y. 1995) ("The causal link between the arrest and identification is obvious and unattenuated—the illegal seizure and detention of defendant not only made the identification possible, but was done for the purpose of displaying him to the undercover officer and thereby securing a pretrial identification to be used at the trial to bolster her in-court identification.").

fication is tainted if the out-of-court identification aided the officers in making the in-court identification.

¶ 69. The majority opinion concludes that the in-court identifications: are not tainted because the identifying officers, Detective Wagner and Officer Terrell, were experienced in law enforcement in general and drug enforcement in particular, they had ample opportunity to view the suspect and the drug buy, their views of the defendant were unobstructed, they were trained in how to later identify a suspect, they gave consistent descriptions, and less than three months elapsed between their observations of the alleged crime and the in-court identifications.[14]

¶ 70. I disagree with this reasoning. Because defense counsel did not move to suppress the out-of-court identifications, the circuit court never faced the question of whether the in-court identifications were tainted. The record does not conclusively demonstrate that the in-court identifications were not tainted by the out-of-court identifications outside the mother's home.

¶ 71. This court is making its determination of whether the in-court identifications were tainted on the basis of an incomplete record. Defense counsel failed to move to suppress both the out-of-court and the in-court identifications. Therefore, defense counsel did not question any of the witnesses to show whether the in-court identifications were tainted, and the defendant did not have an opportunity at trial to show a taint. We do not know what the officers would have said on questioning about the relation between the in-court identification and the identification outside the mother's home. The State at trial tied the in-court identifications to the out-of-court identifications. The *Machner* hearing

---

[14] Majority op., ¶ 36.

would give the defendant the opportunity to question the officers to show a taint.

¶ 72. Notwithstanding the defense counsel's failure to move to suppress the identifications and to question the witnesses to show a taint, the smell of a taint pervades the record and entitles the defendant to a *Machner* hearing.

¶ 73. A second claim of ineffective assistance of counsel in the instant case is defense counsel's failure to challenge the entry into the home of the defendant's mother to arrest the defendant as an illegal entry, thus making the out-of-court identifications at the mother's house inadmissible. The defendant never consented to the entry. If the defendant's mother consented to the police entering the home,[15] the defendant might not have a constitutional challenge under the Fourth and Fourteenth Amendments to the United States Constitution to law enforcement's entry into the home.[16]

¶ 74. In denying the defendant's motion for a *Machner* hearing, the circuit court stated that the trial testimony it had already heard from the defendant's mother and the officer who confronted the defendant's mother provided "essentially the same testimony the court would have heard" in a *Machner* hearing or in a hearing on a suppression motion.

---

[15] The house was the defendant's mother's home, which is why she could consent to search. The defendant, however, lived at his mother's house, which is why he has standing to challenge the search. *Bumper v. North Carolina,* 391 U.S. 543 (1968) (family members residing with owner or tenant have same standing to challenge entry as owner or tenant).

[16] *See Georgia v. Randolph,* ___ U.S. ___, 126 S. Ct. 1515 (2006) (holding warrantless search unreasonable as to defendant who expressly refused to consent to entry).

¶ 75. I agree with the court of appeals that the testimony the circuit court heard at trial is not "essentially the same" as the testimony the circuit court might have heard at a *Machner* hearing. The circuit court's explanation does not provide a satisfactory basis for denying the request for a *Machner* hearing.[17] As the court of appeals observed, both the defendant's mother and the officer "were not questioned thoroughly at trial about whether [the defendant's mother] consented to the entry. And other officers who witnessed the entry did not testify [at trial]. We do not know if their testimony would have supported [the officer's or the defendant's mother's] version of events."[18] Notably, however, the defendant's mother testified at trial that she did not provide consent to enter the home and that she called 9-1-1 to object to the police entry.

¶ 76. Because defense counsel did not challenge the entry into the home of the defendant's mother, the circuit court never took testimony about consent. Without a hearing or uncontroverted testimony, the record does not provide a basis upon which to make a determination of consent. Thus, consent should be determined at an evidentiary *Machner* hearing.

¶ 77. Without consent and without a warrant, generally law enforcement may not constitutionally enter a home to make an arrest.[19] There are, however, exceptions, such as exigent circumstances, permitting the warrantless entry into a home to effect an arrest.

---

[17] *Roberson,* 287 Wis. 2d 403, ¶ 13.

[18] *Roberson,* 287 Wis. 2d 403, ¶ 13.

[19] In *Payton v. New York,* 445 U.S. 573, 586 (1980), the Supreme Court stated that "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." (internal quotation marks omitted).

None of the exceptions are conclusively established at the motion stage in the instant case.

¶ 78. The remedy for a warrantless arrest on a warrantless entry into a home ordinarily is suppression of the evidence obtained from the warrantless arrest.[20] In the instant case, the evidence obtained from the warrantless entry into the home was the out-of-court identifications of the defendant outside the mother's home.

¶ 79. Even if the entry into the home were illegal, the out-of-court identifications were not necessarily subject to the exclusionary rule. If the police had probable cause to arrest the defendant, the out-of-court identifications may be admissible under *New York v. Harris,* 495 U.S. 14 (1990). In *Harris,* the United States Supreme Court held that a confession made by the accused outside the home after an illegal entry into the home was admissible when the police had probable cause (developed apart from the illegal entry) to arrest the accused in the home.[21]

---

[20] *New York v. Harris,* 495 U.S. 14, 18–19 (1990) ("[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality.").

[21] *Harris,* 495 U.S. at 21 ("[W]here the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton.*").

There is substantial dispute regarding the scope and validity of the *Harris* exception to the exclusionary rule. *See, e.g., State v. Luurtsema,* 811 A.2d 223, 232–234 (Conn. 2002) (declining to follow *Harris* on state law grounds); *Bryant v. United States,* 599 A.2d 1107, 1112 (D.C. 1991) (declining to extend *Harris* exception to exclusionary rule to situation where police

¶ 80. *Harris* involved a confession at the police station after an illegal arrest. The Court reasoned that after Harris had been removed from the home his continued custody was lawful, so his statement was not the product of the unlawful custody. This case differs from *Harris* in that in the instant case an identification was made after an illegal entry into a home after what is arguably a *Terry* detention.

¶ 81. In any event, this court has never adopted the *Harris* exception to the exclusionary rule. Furthermore, the defendant and State disagree whether the officers had probable cause to arrest the defendant before the officers entered the home. The State's brief asserts that the defendant's arrest was based on probable cause obtained *before* the officers entered the home. The defendant argues that the officers seized and searched the defendant in the home, as well as five other men, but did not arrest the defendant (or any of the other men seized in the home) until after the

obtained probable cause only because they found defendant in house).

The defendant contends that there was no probable cause to arrest him before he was removed from the house. The defendant asserts that he was not arrested until after he was identified by the officers outside of the house. The officers failed to maintain continuous visual contact with the person dealing drugs, casting doubt whether any person inside the home was the same person from whom the officer purchased the drugs.

The defendant argues that he was subject to an investigative detention (a *Terry* stop) prior to being identified outside the home. *See Terry v. Ohio,* 392 U.S. 1, 12–13 (1968). If the defendant was removed from his home as part of a *Terry* stop, such action was unconstitutional even if the officers had the requisite reasonable suspicion. *Harris* does not make an exception to the exclusionary rule for the fruits of an improper investigative detention.

officers identified only the defendant outside the home. In other words, the officers in the home could not identify the defendant (or any of the other men) as the person the other officers saw in the drug deal until each man was brought outside the home and was identified by the officers. The reason that the officers could not identify any of the men in the house as the perpetrator was that the officers' description of the perpetrator was too general. Numerous males in the area might have matched the description. An evidentiary *Machner* hearing would allow the circuit court to determine whether the officers had probable cause to arrest the defendant in the home, whether the defendant's identification outside the home was the product of the illegal entry into the home, and whether the exclusionary rule applies.[22]

¶ 82. I conclude that the motion was sufficient to justify a *Machner* evidentiary hearing on whether defense counsel's failure to challenge the entry into the home of the defendant's mother to arrest the defendant was deficient performance.

¶ 83. The defendant has asked only for an evidentiary *Machner* hearing to determine whether defense counsel's performance was deficient. Instead of granting a hearing, the majority opinion decides his claims of deficient performance as a matter of law on a record that is incomplete because defense counsel made no objections to any of the out-of-court or in-court identifications.

¶ 84. I conclude that because the defendant's motion alleged facts that would entitle the defendant to

---

[22] The court of appeals decision is unclear whether the officers had probable cause to arrest the defendant before the identification outside the home.

the relief requested, namely, a *Machner* hearing, the circuit court had no discretion but to hold an evidentiary hearing. Accordingly, I dissent.

¶ 85. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.