**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**November 1, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2021AP1834-CR**

Cir. Ct. No. 2016CF5396

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

ETTER L. HUGHES,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: M. JOSEPH DONALD and JONATHAN D. WATTS, Judges. *Affirmed*.

Before Brash, C.J., Dugan and White, JJ.

¶1     BRASH, C.J.   Etter L. Hughes appeals her judgment of conviction after she pled guilty to four counts relating to the child abuse and neglect of T.W. and J.W.   She also appeals from the order denying her postconviction motion.[1]

¶2     Hughes argues that the trial court erred in accepting an amended information filed by the State that added three additional charges against her, asserting that there was no independent factual basis for those charges and that there was a multiplicity issue that violated WIS. STAT. § 948.03(5)(c) (2015-16).[2]   She further argues that her trial counsel was ineffective for failing to object to the amended information.   Based on these alleged errors, she seeks to withdraw her pleas.   We reject Hughes' arguments and affirm.

## BACKGROUND

¶3     According to the criminal complaint, in August 2016, Hughes moved from Arkansas to Milwaukee with her fiancé and her son, L.F.   Hughes' second cousin was also planning to move to Milwaukee; the cousin had two sons, J.W. who was born in October 2007, and T.W. who was born in June 2009, and asked Hughes to take the boys to Milwaukee with her.

¶4     However, Hughes' cousin never made the move to Milwaukee. Additionally, Hughes' fiancé was arrested shortly after they arrived in Milwaukee, and was extradited back to Arkansas.   As a result, Hughes contacted Mary Martinez, whom Hughes had met when she was previously incarcerated in 2003, seeking a

---

[1]  The Honorable M. Joseph Donald presided over the proceedings for this case, accepted Hughes' pleas, and imposed sentence; we refer to him as the trial court.  The Honorable Jonathan D. Watts decided Hughes' postconviction motion; we refer to him as the postconviction court.

[2]  All references to the Wisconsin Statutes are to the 2015-16 version unless other noted.

place to stay. Martinez allowed Hughes, L.F., T.W., and J.W. to stay with her at her residence on South 19th Street in Milwaukee.

¶5     On the morning of November 29, 2016, Hughes took T.W. to St. Luke's Hospital. Hughes told medical staff that she had discovered T.W. unresponsive when she woke up. T.W. was admitted to the hospital; he was "pulseless, unresponsive, and cold to the touch," and extensive lifesaving measures were begun immediately. Additionally, his body showed "significant signs of trauma," such as lacerations to several areas including his wrists and ankles, and multiple abrasions to his chest and back. Hospital staff immediately notified the police, suspecting severe child abuse.

¶6     T.W. was transferred to Children's Hospital, where lifesaving measures were continued. However, T.W. succumbed to his injuries that afternoon.

¶7     Prior to his passing away, T.W. was examined at Children's Hospital by a pediatric child abuse specialist. The doctor found multiple patterned injuries "too numerous to count" all over T.W.'s body, which were consistent with being restrained by the hands and neck, beaten with a belt or cord, and struck with a long, straight object. T.W. had multiple other injuries which were in various stages of healing, along with an injury consistent with a cigarette burn.

¶8     T.W. was also severely malnourished. He weighed only forty-four pounds, when a boy his age should have generally weighed approximately fifty-five pounds. The doctor noted several other "classic characteristics of malnutrition" during her exam.

¶9     The doctor concluded that T.W.'s injuries would have caused "intense pain and suffering." His injuries and state of malnutrition were "diagnostic for

severe, life-threatening child physical abuse and medical and nutritional neglect," which resulted in T.W.'s death.

¶10    J.W. was also hospitalized at that time for severe malnutrition. J.W. was examined and was found to have numerous injuries consistent with severe physical abuse, including the same patterned injuries indicative of being beaten and tied down at the arms and neck.

¶11    Police detectives interviewed Hughes, who denied physically abusing T.W. or J.W., and had no explanation for their malnutrition. They also interviewed L.F., Hughes' son, who was thirteen years old at the time. L.F. told the detectives that he had seen Martinez abuse both T.W. and J.W. multiple times, using "her hands and a shoe."

¶12    Both Hughes and Martinez were taken into custody. Detectives then interviewed Hughes again, who stated that she had noticed wounds on T.W. and J.W., but thought that they were hurting each other. She also said that the boys had begun losing weight shortly after they moved into Martinez's residence, and that the home was "infested with rats and mice." Additionally, Hughes stated that the boys had "exhibited many behavior issues" that had made Martinez "very angry," and that Martinez had "express[ed] a desire to hurt both children." Hughes also said that Martinez would not let her call 911 when she had discovered that T.W. was unresponsive. Hughes was convinced that Martinez had been abusing the boys.

¶13    Forensic interviews were conducted with J.W. and L.F. J.W. stated that Martinez had repeatedly abused both he and T.W. and had denied them food. L.F. stated that he had seen Martinez abuse both boys multiple times, punching them with a closed fist and beating them with a shoe. L.F. further explained that the night prior to T.W.'s death, Martinez had hit T.W. repeatedly in the head and face, and

4

had punched him in the back with enough force that he fell to the ground and was "losing his breath."

¶14     In further investigating this matter, the police detectives interviewed Carlos Gonzalez, Martinez's adult son, who also lived at the residence. Gonzalez told the detectives that he had seen Hughes strike both T.W. and J.W., and that Hughes had given Martinez "permission to 'physically discipline'" the boys. Gonzalez had never observed Martinez physically abusing the boys, but he had heard sounds of such abuse toward T.W. and J.W. from his bedroom. Additionally, Gonzalez had seen the boys "tied up and seated on the floor behind a couch," and said that Martinez told him Hughes had tied them up.

¶15     Hughes and Martinez were charged in December 2016. They were both charged with child neglect resulting in death with regard to T.W., and child neglect resulting in great bodily harm with regard to J.W., both as a party to a crime. Additionally, Martinez was charged with two counts of repeated acts of child abuse causing bodily harm, while Hughes was charged with two counts of failure to act to prevent bodily harm to a child. Both Hughes and Martinez waived their preliminary hearings and entered not guilty pleas. The cases were severed shortly thereafter.

¶16     Furthermore, at the scheduling conference in January 2017, where the motion to sever was discussed, the State informed the trial court that J.W., who was by then in foster care, had started making additional "significant allegations" as to the role Hughes had played in the abuse of both boys. Thus, the State noted that the charges contained in the criminal complaint "may only scratch the surface" of Hughes' involvement in the abuse.

¶17     Subsequently, at a bail hearing held in March 2017, the State informed the trial court that an additional forensic interview had been conducted with J.W.,

5

where he disclosed that Hughes had "played a much more active role" in the abuse of the children. Therefore, the State said that if the matter proceeded to trial, it anticipated that the charges against Hughes would be "increased" due to this new information. The State also had provided a copy of the new forensic interview to Hughes' counsel in February 2017, and had mentioned the likelihood of amending the charges at that time as well.

¶18 The State did indeed file an amended information for Hughes on the morning of her final pretrial conference, in May 2017. The count relating to T.W.—child neglect resulting in death—was amended to first-degree reckless homicide. The State also added two counts of repeated acts of physical abuse of a child causing great bodily harm. Hughes did not object to the amended information, waived its reading, and entered pleas of not guilty.

¶19 A few days later, Hughes entered into a plea agreement in which she agreed to plead no contest to the original charges in the complaint.[3] The trial court accepted her pleas and imposed a sentence that totaled twenty years of initial confinement and fifteen years of extended supervision.

¶20 Hughes subsequently filed a postconviction motion seeking to withdraw her pleas on the grounds that they were not knowingly and voluntarily entered. Specifically, Hughes asserted that she was "induced" to enter the pleas as a result of the State's filing the amended information with "upgraded" charges, for which there was no factual basis, and that she was "significant[ly] prejudiced" by

---

[3] Hughes' pleas to the first two counts—child neglect resulting in death and child neglect resulting in great bodily harm—were entered without the party to a crime modifiers.

this "last-minute" filing. Hughes further argued that her trial counsel was ineffective for failing to object to the filing of the amended information.

¶21 The postconviction court rejected Hughes' claims. The court was persuaded by the State's argument that

> the amended charges filed by the State were transactionally related to the original facts and circumstances spelled out within the criminal complaint and flowed directly from the additional investigation conducted by the Milwaukee Police Department, namely the second forensic interview of J.W. and the briefing of Mary Martinez, each of which provided a detailed account of [Hughes'] repeated abuse and neglect of J.W. and T.W.

The postconviction court further noted the statement of Gonzalez, Martinez's adult son, in the complaint, where he indicated that he had witnessed Hughes abusing T.W. and J.W. The court found that these allegations were sufficient to establish probable cause for the allegations in the amended information, and thus determined that the trial court did not err in allowing the amended information to be filed.

¶22 The postconviction court further found that Hughes had adequate notice of the amended charges, noting that she was aware the State was anticipating filing the same "as early as February 2017." As such, the court concluded that Hughes had not demonstrated that she suffered prejudice as a result of the timing of the filing of the amended information.[4] Furthermore, as there was no reasonable probability that the pleading would have been struck, the court determined that

---

[4] The amended information was filed on May 26, 2017, just days before Hughes' trial was scheduled to start on June 5, 2017. On appeal, Hughes did not include the argument from her postconviction motion regarding a lack of sufficient notice for the amended charges. We therefore do not discuss that issue further. *See State v. Ledger*, 175 Wis. 2d 116, 135, 499 N.W.2d 198 (Ct. App. 1993) ("On appeal, issues raised but not briefed or argued are deemed abandoned.").

Hughes' ineffective assistance claim failed as well. It therefore denied Hughes' motion without a hearing. This appeal follows.

## DISCUSSION

¶23 In seeking plea withdrawal after sentencing, a defendant "must prove, by clear and convincing evidence, that a refusal to allow withdrawal of the plea would result in 'manifest injustice.'" *State v. Brown*, 2006 WI 100, ¶18, 293 Wis. 2d 594, 716 N.W.2d 906 (citation omitted). One way to establish a manifest injustice is to show that the plea was not knowingly, intelligently, and voluntarily entered, because when a plea does not meet this standard it "violates fundamental due process." *State v. Johnson*, 2012 WI App 21, ¶8, 339 Wis. 2d 421, 811 N.W.2d 441 (citation omitted).

¶24 Thus, whether a plea was knowingly, intelligently, and voluntarily entered is a question of constitutional fact. *Id.* For our review of such an issue, we will uphold the trial court's findings of fact unless they are clearly erroneous, but we independently review the application of the relevant law to those facts. *Id.*

¶25 All of Hughes' claims are based on alleged defects in the amended information, which are "extrinsic to the plea colloquy," as opposed to arguing that the plea colloquy conducted by the trial court was deficient in some way. *State v. Hoppe*, 2009 WI 41, ¶3, 317 Wis. 2d 161, 765 N.W.2d 794. We therefore review her claims within the *Nelson*/*Bentley*[5] framework for analyzing plea withdrawal requests. *Hoppe*, 317 Wis. 2d 161, ¶3. As such, we independently review Hughes' motion to determine whether it "'on its face alleges facts which would entitle the

---

[5] *See **Nelson v. State***, 54 Wis. 2d 489, 195 N.W.2d 629 (1972); ***State v. Bentley***, 201 Wis. 2d 303, 548 N.W.2d 50 (1996).

8

defendant to relief,' and whether the record conclusively demonstrates that the defendant is entitled to no relief," to determine whether Hughes is entitled to an evidentiary hearing on her claims. *State v. Howell*, 2007 WI 75, ¶¶77-78, 301 Wis. 2d 350, 734 N.W.2d 48 (citations omitted).

¶26    The first alleged defect argued by Hughes is that the criminal complaint did not contain sufficient facts to support the charges in the amended information. The State may file "*any* charge in the information so long as it was based on the facts adduced at the preliminary hearing or on the facts set out in the complaint when a preliminary hearing is waived." *State v. Michels*, 141 Wis. 2d 81, 88, 414 N.W.2d 311 (Ct. App. 1987). In this case, Hughes waived her right to a preliminary hearing, so we look to the criminal complaint to determine whether sufficient facts were alleged. *See id.*

¶27    A charge is properly brought in the information if it is "related to the same events set out in the complaint regardless of the level of the charge." *Id.* at 89. Charges are considered "transactionally related" if they "ar[i]se from a common nucleus of facts," or, put another way, if they are "related in terms of parties involved, witnesses involved, geographical proximity, time, physical evidence, motive and intent[.]" *State v. Williams*, 198 Wis. 2d 516, 535, 544 N.W.2d 406 (1996) (citation omitted).

¶28    In the amended information, the State changed the charge against Hughes with regard to T.W. from child neglect resulting in death, as a party to a crime, to first-degree reckless homicide, as a party to a crime. It also added two counts of repeated physical abuse of a child—one for each child—as a party to a crime. The facts set forth in the complaint attributed T.W.'s death to the numerous injuries he had sustained from physical abuse, as well as from being severely

malnourished. While the facts in the complaint primarily point to Martinez as the abuser, it also contained Gonzalez's statement that he had witnessed Hughes striking the children. Gonzalez further stated that he had seen the children tied up at one point, and that Martinez had told him that Hughes did it. Based on these allegations, we conclude that the charges in the amended information were transactionally related to those in the complaint. *See id.*

¶29 Hughes' second argument regarding defects in the amended information relates to the two counts of repeated physical abuse of a child that were added. Specifically, Hughes asserts that because WIS. STAT. § 948.03(5)(c) prohibits charging a defendant with repeated acts of abuse *and* with failure to prevent abuse if the charges cover the same time frame, those new charges in the amended information were multiplicitous.

¶30 The State concedes this point, but argues that this issue was forfeited by Hughes because she made no objection on multiplicity grounds when the amended information was filed. The State points to the rule that a defendant who pleads guilty or no contest generally gives up the right to appeal "all nonjurisdictional defects, including constitutional claims[.]" ***State v. Kelty***, 2006 WI 101, ¶18 & n.11, 294 Wis. 2d 62, 716 N.W.2d 886 (citation omitted; brackets in ***Kelty***). However, a defendant nevertheless retains the right "to challenge the authority of the [S]tate to prosecute [him or] her and the power of a court to enter the conviction or impose the sentence, where the existing record allows the court to determine whether the defendant's double jeopardy rights have been violated." ***Id.***, ¶3. That is the case here, because the record clearly demonstrates that the new charges of repeated physical abuse of a child that were added in the amended information were statutorily prohibited, since the charges of failure to prevent abuse from the original complaint remained in the amended information. *See* WIS. STAT.

§ 948.03(5)(c). Therefore, we conclude that this claim was not forfeited. *See Kelty*, 294 Wis. 2d 62, ¶3.

¶31 The State also argues that Hughes' claim is moot, since she pled no contest to the charges in the initial complaint, and the additional charges in the amended information were dismissed. We disagree.

¶32 "An issue is moot when its resolution will have no practical effect on the underlying controversy." *State ex rel. Olson v. Litscher*, 2000 WI App 61, ¶3, 233 Wis. 2d 685, 608 N.W.2d 425. We generally do not consider issues on appeal which are moot. *Id.* However, Hughes' argument regarding the multiplicity of the charges goes directly to her plea withdrawal argument. A defendant who enters into a plea agreement while "relying on misinformation" does not truly know the "actual value" of the plea offer and, as a result, is "prevented from making a reasoned decision whether to proceed to trial or plead." *State v. Dillard*, 2014 WI 123, ¶69, 358 Wis. 2d 543, 859 N.W.2d 44. Such misinformation, therefore, may "undermine the defendant's capacity to knowingly, intelligently, and voluntarily choose between accepting the State's plea offer and proceeding to trial." *Id.* Thus, Hughes' claim on this issue is not moot.

¶33 The forfeiture and mootness arguments aside, the State frames Hughes' claim as an argument that her pleas were not knowing, intelligent, and voluntary because she thought she was facing more prison time due to the multiplicitous additional charges. Our supreme court has previously found that "affirmative misinformation about the law provided by the prosecutor and defense counsel can support a holding that withdrawal of a plea of guilty or no contest must be permitted because the plea is uninformed and its voluntariness is compromised." *Id.*, ¶39. Hughes asserts that should be the case here.

11

¶34 Hughes cites *Dillard* in support of her argument. In *Dillard*, the defendant, the State, and the trial court had all proceeded under the mistaken belief that the defendant was subject to the persistent repeater enhancer which, when applied to the charge against him of armed robbery, meant that he was facing a mandatory life sentence with no opportunity for extended supervision. *Id.*, ¶6. However, Dillard did not meet the criteria of a persistent repeater, and thus was instead actually facing a maximum sentence of thirty-two years of initial confinement and eighteen years of extended supervision. *Id.*, ¶¶6, 18. Our supreme court held that Dillard was entitled to withdraw his plea because "the fundamental error of law [about the applicability of the persistent repeater enhancer to the defendant] that pervaded the plea negotiations and sentencing" had rendered that plea unknowing, unintelligent, and involuntary. *Id.*, ¶35 (citation omitted; alteration in *Dillard*).

¶35 Hughes also cites this court's analysis in *State v. Douglas*, 2018 WI App 12, 380 Wis. 2d 159, 908 N.W.2d 466, as being applicable. In *Douglas*, the defendant was charged with both first and second-degree sexual assault of a child under the age of sixteen; both charges arose from the same incident. *Id.*, ¶2. At the final pre-trial hearing, at which a potential plea agreement was discussed, the trial court advised Douglas that he was "facing about 100 years in prison" if he was convicted of both counts. *Id.*, ¶4. Douglas subsequently entered into a plea agreement in which he pled no contest to second-degree sexual assault of a child. *Id.*, ¶6.

¶36 In a postconviction motion, Douglas sought to withdraw his plea as not knowingly, voluntarily, and intelligently given because he could not have been convicted of both of those charges, as second-degree sexual assault of a child is a lesser-included crime of first-degree sexual assault of a child. *Id.*, ¶12. Thus, he

actually was facing either a maximum of sixty years of imprisonment, with a mandatory minimum of twenty-five years of initial confinement for a conviction on the first-degree charge, or a maximum of forty years of imprisonment with no mandatory minimum for a conviction on the second-degree charge, as opposed to 100 years of imprisonment as indicated by the trial court. *Id.*, ¶¶12-13. He therefore argued that "he was not truly aware of the direct consequences of his plea." *Id.*, ¶¶11.

¶37 Both the State and the postconviction court acknowledged the error, but Douglas's postconviction motion was nevertheless denied. *Id.*, ¶¶8, 12. This court reversed, relying on *Dillard*. *Douglas*, 380 Wis. 2d 159, ¶18. We concluded that the misinformation regarding the charges "constitute[d] an error of law because Douglas could not have been convicted of both the greater offense and the lesser-included offense," and he was thus "unaware of the direct consequences of his plea and could not make a reasoned decision about whether to proceed to trial or to enter a plea." *Id.*

¶38 Indeed, a manifest injustice occurs "when there has been 'a serious flaw in the fundamental integrity of the plea.'" *Johnson*, 339 Wis. 2d 421, ¶12 (citations omitted). In analyzing whether such a flaw has occurred, we noted in *Douglas* "the importance of the accuracy of information, prior to a plea, regarding a defendant's potential exposure to a penalty so that the defendant can reasonably evaluate the benefit of the offered bargain[.]" *Id.*, 380 Wis. 2d 159, ¶17.

¶39 We are not persuaded that the conceded error here—including the two counts of failure to prevent abuse together with the two counts of repeated physical abuse of a child in the amended information—affected Hughes' ability to reasonably evaluate the benefit of the plea offer presented by the State. In comparing the

13

penalties for the charges, we note that for the original charges set forth in the complaint, Hughes was facing 49.5 years of imprisonment. *See* WIS. STAT. §§ 948.21(1)(c)-(d); 948.03(4)(b); 939.50(3)(d), (3)(f), (3)(h). If the lesser charges of failure to prevent abuse had been dropped due to the multiplicity issue, the charges in the amended information would have allowed for a maximum prison exposure of 102.5 years. *See* WIS. STAT. §§ 940.02(1); 948.21(1)(c); 948.03(5)(a)5.; 939.50(3)(b), (3)(e), (3)(f). The inclusion of the multiplicitous charges added an additional twelve years, raising the purported maximum exposure to 114.5 years. *See* §§ 948.03(4)(b); 939.50(3)(h). This twelve-year difference in the maximum sentence presented to Hughes is significantly dissimilar from the forty-to-sixty year differential in ***Douglas***, 380 Wis. 2d 159, ¶¶11-12, and the disparity between a mandatory life sentence and a fifty year maximum sentence in ***Dillard***, 358 Wis. 2d 543, ¶6.

¶40 In fact, our supreme court has stated that "[i]t is clear … that a defendant's due process rights are not necessarily violated when he is incorrectly informed of the maximum potential imprisonment" during a plea colloquy. ***State v. Cross***, 2010 WI 70, ¶37, 326 Wis. 2d 492, 786 N.W.2d 64. We acknowledge that the ***Cross*** court was analyzing a ***Bangert*** claim[6] for a plea colloquy deficiency, as opposed to a ***Nelson/Bentley*** claim; however, it has been recognized that the issues raised in each of these types of claims may sometimes be interrelated. *See* ***Howell***, 301 Wis. 2d 350, ¶8. It is in that vein that we find instructive the ***Cross*** court's determination that a defendant who is informed of a maximum punishment which is "higher, but not substantially higher, than that authorized by law," has not made a prima facie case for plea withdrawal. ***Id.***, 326 Wis. 2d 492, ¶30. Similarly, the

---

[6] *See* ***State v. Bangert***, 131 Wis. 2d 246, 389 N.W.2d 12 (1986).

twelve-year difference in the maximum sentence exposure in this case for the prohibited charges was not significantly higher than the potential sentences for the valid charges.

¶41 As a result, we do not find the circumstances here to be similar to those in **Douglas** and **Dillard**, where this court and our supreme court found the misinformation at issue in each case to be errors of law so pervasive that they affected those defendants' abilities to "evaluate the benefit of the offered bargain." *See* **Douglas**, 380 Wis. 2d 159, ¶17; **Dillard**, 358 Wis. 2d 543, ¶¶78-79. In other words, we do not deem this to be "'a serious flaw in the fundamental integrity of the plea.'" **Johnson**, 339 Wis. 2d 421, ¶12 (citations omitted). Therefore, based on the undisputed facts in the record relevant to this issue, we conclude that Hughes has not met her burden of demonstrating that the withdrawal of her pleas is necessary to correct a manifest injustice. *See* **Brown**, 293 Wis. 2d 594, ¶18.

¶42 Furthermore, based on this conclusion, Hughes' ineffective assistance of counsel claim fails as well. Although a manifest injustice as it relates to plea withdrawal may be demonstrated by proving ineffective assistance of counsel, *see* **State v. Taylor**, 2013 WI 34, ¶49, 347 Wis. 2d 30, 829 N.W.2d 482, to succeed on such a claim, the defendant must prove both prongs of the **Strickland**[7] test—that his or her trial counsel's performance was deficient and that the deficiency prejudiced the defense—in order to prevail. **State v. Allen**, 2004 WI 106, ¶26, 274 Wis. 2d 568, 682 N.W.2d 433. We review independently the legal questions of whether a deficiency and prejudice have been established. *See* **State v. Roberson**, 2006 WI 80, ¶24, 292 Wis. 2d 280, 717 N.W.2d 111.

---

[7] *See* **Strickland v. Washington**, 466 U.S. 668 (1984).

¶43     Although Hughes' trial counsel could be deemed deficient for failing to object to the additional charges in the amended information that were statutorily prohibited, Hughes has not demonstrated that she was prejudiced by this error. Hughes argues that she had remained in trial posture throughout the proceedings, and only entered into the plea agreement due to the filing of the amended information. Thus, she asserts that her trial counsel's failure to object to the prohibited charges when the amended information was filed was prejudicial.

¶44     However, this argument relies on Hughes' earlier argument that there was no factual basis for the amended information, which we have rejected. Therefore, Hughes' argument for plea withdrawal is based on the twelve-year differential from the inclusion of the prohibited charges in the amended information, which would have presumably been dismissed. Under a corrected amended information, Hughes would have been evaluating prison exposure of 102.5 years— not 114.5 years—in comparison with the 49.5 years of prison exposure for the charges in the initial complaint. Hughes has not demonstrated that there was a reasonable probability of a different outcome—the standard for establishing prejudice, *see Strickland*, 466 U.S. at 694—if she had evaluated the plea agreement without those additional twelve years. *See State v. Provo*, 2004 WI App 97, ¶15, 272 Wis. 2d 837, 681 N.W.2d 272 ("[a] defendant who alleges that counsel was ineffective by failing to take certain steps must show with specificity what the actions, if taken, would have revealed and how they would have altered the outcome of the proceeding" (citation omitted; brackets in *Provo*)).

¶45     In sum, we reject Hughes' claims that her pleas were not knowingly, voluntarily, and intelligently entered. *See Johnson*, 339 Wis. 2d 421, ¶8. Accordingly, we affirm her judgment of conviction and the order denying her postconviction motion.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.